Auther STRINGER, Plaintiff-Appellant,

v.

Charles J. ROWE et al.,
Defendants-Appellees.

No. 77–1985.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 11, 1980.

Decided Feb. 22, 1980.

Rehearing and Rehearing En Banc
Denied April 30, 1980.

Robert A. Wason, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Victor Yipp, Illinois Dept. of Corrections, Chicago, Ill., for defendant-appellee.

Before SWYGERT, CUMMINGS, and SPRECHER, Circuit Judges.

PER CURIAM.

Plaintiff, an inmate at Stateville Correctional Center, appeals from the district court's order granting defendants' motions for summary judgment in a suit under 42 U.S.C. § 1983, alleging that certain officials of the Illinois Department of Corrections violated plaintiff's constitutional rights during the course of and following the disposition of a disciplinary report filed against him. We affirm in part and reverse in part.

According to his *pro se* complaint, Stringer was incarcerated at the Pontiac Correctional Center in Pontiac, Illinois, following his 1967 conviction for murder and armed robbery. On June 10, 1976 Stringer received a disciplinary report for pressuring three inmates to join an organization. The report, filed by defendant Donald Polizzi, a correctional lieutenant and internal affairs investigator at Pontiac, was based solely on interviews with the three inmates involved in the incident. As a result of the disciplinary report plaintiff was placed on deadlock in his cell. Three days later, he appeared before the Institutional Adjustment Committee [the "Committee"], which was chaired by defendant Thaddeus Pinkney, assistant warden. The Committee decided to further investigate and to place plaintiff in segregation pending completion of the

investigation. Before this time plaintiff had been employed at the Pontiac law library.

On June 25, 1976 Stringer was removed from his cell. Handcuffed and wearing a security belt, he was brought before the Committee for a hearing on the charge filed against him. During his interview Stringer gave the Committee a list of witnesses who would testify on his behalf; however, plaintiff was informed that there was sufficient evidence to support the allegation of pressuring the inmates. In response to his questions, the Committee informed Stringer that in reaching the decision they relied on a phone call from defendant Fred Finkbeiner, the warden, stating he had additional information to support the charge against plaintiff. The Committee admitted that it did not know the substance of the information. Stringer was then assigned to the segregation unit of the prison.

Following his disciplinary hearing, Stringer was returned to his cell in the segregation unit by defendant Jack Conkle, a correctional officer at Pontiac, and four other prison guards. Shortly thereafter, defendant Polizzi approached plaintiff's cell and informed him that he was to be placed in a "control" cell of the segregation unit. Plaintiff, handcuffed and locked in his cell, alleges that he was talking with Polizzi about the manner in which he conducted the investigation of the charge when Conkle, without provocation, sprayed plaintiff in the face and on his back with mace. Plaintiff then was taken to the control cell and, approximately thirty minutes later, he was told that he was to be transferred to Menard Correctional Center, Menard, Illinois. He arrived at Menard later the same day and was placed in segregation, where he remained until September 8, 1976. Following the transfer, several of Stringer's personal papers, including his trial transcript and a habeas corpus petition, never arrived at the Menard prison.

One week after his transfer from Pontiac to Menard, plaintiff contacted defendant Richard Gramley, transfer coordinator for the Department of Corrections, to complain about his transfer. In response, Gramley told Stringer that he approved plaintiff's transfer because of his failure to adjust to the programming at Pontiac. (In his complaint, plaintiff alleged that the transfer was approved by defendant Finkbeiner to cover the errors of other prison officials in the investigation and disposition of the June 10, 1976 disciplinary report.)

Stringer grieved the disciplinary report, his transfer to Menard, and loss of property through the Department of Corrections grievance procedures. On August 5, 1976 the Administrative Review Board [the "Board"] met with Stringer. It found that there had been "no violations of Administrative Regulation 804 in the disposition of this [disciplinary] report."[1] It further found that the transfer from Pontiac to Menard "was properly ordered and administered." The Board recommended that the warden of Menard prison have his staff contact Pontiac prison and "ensure that all of Mr. Stringer's personal property is delivered to him as expeditiously as possible." Defendant Charles Rowe, director of the Department of Corrections, concurred in these findings and recommendations. A copy of the decision was sent both to defendant Finkbeiner and to defendant Gramley. Stringer requested a rehearing with the Board. The request was granted on September 2, 1976. At the rehearing, the Board found that the Committee had failed to take "final action" on the disciplinary report and that "AR 804 has indeed been violated." The Board ordered the report be expunged from Stringer's record. Additionally, Stringer was released from segregation and his good-time credit restored. The Board again found that the transfer "was properly carried out." Defendant Rowe concurred in the findings and recommendations.

---

1. Administrative Regulation 804 governs the Department of Corrections' administration of discipline.

On October 27, 1976 Stringer filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983 seeking monetary, declaratory, and injunctive relief against certain officials of the Department of Corrections.[2] The complaint charged numerous constitutional violations. In essence plaintiff alleged that: (1) he was convicted of a disciplinary violation and placed in segregation in violation of his due process and equal protection rights; (2) he was denied due process and equal protection of the laws by being transferred from the Pontiac prison to the Menard prison; (3) he was maced without provocation in violation of the Eighth Amendment; and (4) he was deprived of his personal property in violation of the Due Process Clause.

With the exception of Finkbeiner, all the defendants moved to dismiss the complaint or, in the alternative, for summary judgment. On July 21, 1977 the district court granted defendants' motions for summary judgment. As to the first two claims, the district court held that plaintiff failed to state a section 1983 cause of action because he had not challenged the disciplinary procedures employed in processing the charge against him and had not offered authority for the position that Illinois law establishes a liberty interest in being placed in a particular prison. The court further held that summary judgment was proper on the third claim because the "undisputed affidavits" showed that plaintiff had been maced because he was belligerent and threatening to prison officials. Lastly, the district court concluded that the fourth claim failed to state a cause of action under 42 U.S.C. § 1983 because plaintiff had not alleged that the confiscation of his property by the prison officials was intentional. This appeal followed.

### Count I: Disposition of Disciplinary Report

█ In granting defendants' summary judgment motions, the district court held that plaintiff failed to state a claim that he was denied due process in connection with the disposition of the disciplinary report filed against him. The decision was grounded on plaintiff's failure in his complaint to "in any way challenge the disciplinary procedures employed in processing his June 10, 1976 charge," *citing Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Plaintiff maintains that he has stated a due process claim on the basis of his allegations that Finkbeiner improperly interfered with the Committee proceedings and that Polizzi failed to conduct a reasonable investigation of the charge against him.

Before we can test plaintiff's complaint on this issue, a threshold question, which the district court failed to address, must be resolved: whether the placement of Stringer in disciplinary segregation infringed a liberty interest protected by the Due Process Clause. Following the decisions in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), this court has held that a prisoner is not constitutionally entitled to procedural protections unless ". . . he has some justifiable expectation rooted in state law that the challenged action will not be taken absent the occurrence of a specified factual predicate." *Arsberry v. Sielaff,* 586 F.2d 37, 45 (7th Cir. 1978). In *Meachum v. Fano, supra,* 427 U.S. at 229, 96 S.Ct. at 2540, the Supreme Court held that the state could create a liberty interest "by statute, by rule or regulation." This court has recognized that a prisoner may have due process rights as a result of entitlements created by prison regulations and by official policies or practices. *Arsberry v. Sielaff, supra,* 586 F.2d at 47; *Durso v. Rowe,* 579 F.2d 1365, 1369 (7th Cir. 1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979).

---

**2.** The named defendants are Jack Conkle, Fred L. Finkbeiner, Richard B. Gramley, Thaddeus E. Pinkney, Donald Polizzi, and Charles J. Rowe. Service, however, was never effected on. defendant Finkbeiner. On January 17, 1977 plaintiff filed a motion to substitute H. W. Sabin, who chaired plaintiff's Adjustment Committee hearing. This motion was never ruled on by the district court.

Plaintiff argues that by virtue both of Illinois statute and of prison regulation, he had a justifiable expectation that he would not be placed in segregation absent proof of a serious violation. Both section 3–8–7 of the Illinois Unified Code of Correction, Ill. Rev.Stat. ch. 38, § 1003–8–7(d) and (e) [3] and Administrative Regulation 804(II)(A)(3) and (4) [4] of the Department of Corrections distinguish between minor and serious disciplinary violations. According to AR 804, minor violations are handled informally by a Program Team, which may impose less stringent sanctions such as the loss of special privileges. AR 804(II)(K). [5] Serious violations, such as in this case, are referred to the Committee. The regulation further provides that in the latter case a hearing must be held and sanctions such as placement in disciplinary segregation and revocation of good time credit may be imposed. AR 804(II)(B). [6]

To support the argument that his segregation constituted infringement of a protectible liberty interest, plaintiff analogizes AR 804's two-tier system for disciplining prisoners to the facts in *Wolff v. McDonnell, supra.* There a state statute provided that the right to good time credit could be forfeited only for serious misconduct, whereas privileges could be revoked for lesser misconduct. The Supreme Court held that the prisoner had a protectible liberty interest because the statute restricted the discretion of prison authorities. The Court commented:

> [T]he State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Id.* 418 U.S. at 557, 94 S.Ct. at 2975. In further support of his position, plaintiff points to the decisions of other courts which have held that prisoners have a liberty interest in not being placed in disciplinary segregation absent proof of a serious rule violation. *See Walker v. Hughes,* 558 F.2d 1247 (6th Cir. 1977); *Bills v. Henderson,* 446 F.Supp. 967 (E.D.Tenn.1978).

When plaintiff's complaint is given a liberal reading, *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), we conclude that plaintiff alleged that Illinois prison regulation 804 creates the right to be free from disciplinary segregation except upon a finding of major misconduct by the Committee. In responding to the complaint, defendants did not state why this regulation does not create a right which conditions the placement of plaintiff in disciplinary segregation upon proof of serious misconduct. Additionally, it appears that the district court did not recognize that AR 804 may be the basis for a claim of entitlement for relief under the Due Process Clause. Accordingly, we reverse the summary judgment order on this issue, and we remand the matter to the district court for further proceedings. In light of our holding, we need not now consider what process was due plaintiff and whether the minimum procedures required by the Due Process Clause were afforded to Stringer. These questions are left for the district court to resolve.

### Count II: Inter-prison Transfer

■ Plaintiff next claims that he was not afforded equal protection of the laws when he was not given a pre-transfer hearing which all Illinois prisoners are entitled to under AR 819. [7] Defendants do not dispute plaintiff's assertion that he was not accorded a pre-transfer hearing. Instead, they contend that plaintiff did not allege an equal protection violation in his complaint but rather, a due process one for which

---

3. Appendix at p. 1001.

4. Appendix at p. 1002.

5. Appendix at pp. 1002–1003.

6. Appendix at pp. 1003–1005.

7. Appendix at pp. 1005–1006.

there can be no recovery, citing *Meachum v. Fano, supra.*

We hold that Stringer has stated a claim that his right to equal protection was violated, and accordingly we reverse the summary judgment order on this issue. Our holding is based on the decision in *Durso v. Rowe,* 579 F.2d 1365 (7th Cir. 1978). The plaintiff in *Durso* argued that prison officials violated the Equal Protection Clause by removing him from the work release program without according him the same type of hearing that was given to other participants before they were removed from the program. The district court dismissed the claim because it considered the allegations as conclusory and also on the belief that the inconsistency in prison management, absent the presence of a suspect class, was insufficient to state an equal protection claim. We reversed and remanded, holding that:

> A state prisoner need not allege the presence of a suspect classification or the infringement of a fundamental right in order to state a claim under the Equal Protection Clause. The lack of a fundamental constitutional right or the absence of a suspect class merely affects the court's standard of review; it does not destroy the cause of action.

*Id.* at 1372. This court recognized that an inconsistency in the operation of a prison may not in itself constitute an equal protection claim, but found that the prisoner's claims were more than allegations revealing merely that he was the victim of erroneous decisionmaking by prison officials. Rather, he alleged that these officials "purposefully denied him a hearing before terminating his work release status even though hearings were customarily afforded to other inmates similarly situated." *Id.*

In his complaint, plaintiff here did not allege that he was treated differently from other inmates, much less specifically allege that AR 819 was violated by defendants. He did allege, however, that he was not given a hearing prior to his transfer from Pontiac to Menard. He further alleged that his transfer was approved by Finkbein-er to mask the errors of other prison officials in the investigation and the disposition of the June, 1976 disciplinary report. Defendants submitted no evidence to the district court explaining why Stringer was not given a hearing prior to his transfer. Taking his allegations as true, we conclude that they are sufficient under the *Durso* rationale to state a claim that plaintiff was denied equal protection in connection with his inter-prison transfer.

### Count III: Mace

According to his complaint, plaintiff, while locked in his cell and talking to defendant Polizzi about his investigation of the disciplinary charge, was sprayed in the face with mace by defendant Conkle, who acted without provocation. Defendants paint a different picture. In support of their motions for summary judgment, defendants submitted affidavits of the Pontiac warden and an officer who was present when the incident occurred. These documents do not deny that plaintiff was maced. Rather, they claim that it was necessary to subdue Stringer with the chemical agent because he refused to give up the security belt and handcuffs which he was wearing. According to the affidavits, Stringer also threatened the five officers who were present at his cell. The district court granted summary judgment to defendants on the basis of Stringer's failure to present material contradicting defendants' showing that force was necessary to subdue him.

In order to establish a violation of the Eighth Amendment, a plaintiff must show that prison officials intentionally inflicted excessive or grossly severe punishment on him or that the officials knowingly maintained conditions so harsh as to shock the general conscience. *United States ex rel. Miller v. Twomey,* 479 F.2d 701, 719–20 (7th Cir. 1973), *cert. denied, Gutierrez v. Dept. of Public Safety,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974). Courts have sanctioned the use of tear gas "when reasonably necessary . . . to subdue recalcitrant prisoners." *Clemmons v. Greggs,* 509 F.2d 1338, 1340 (5th Cir. 1975).

Recent decisions, however, have emphasized that use of chemical agents such as tear gas and mace by prison officials to subdue individual prisoners, rather than to quell large disturbances, should be more restricted. *See, e. g., Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979) ("use of potentially dangerous quantities of the substance is justified only under narrowly defined circumstances . . . ."; *McCargo v. Mister*, 462 F.Supp. 813, 819 (D.Md.1978) ("use of [tear gas and mace] should be strictly limited to circumstances presenting the utmost degree of danger and loss of control").

The essential question on appeal is whether Stringer's claim that the use of mace constituted cruel and unusual punishment was ripe for summary judgment. In *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), the court remarked:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* at 1033. Additionally, it is well-settled that:

> Before summary judgment is granted, the moving party must show that there is no genuine issue as to any material fact, and all pleadings and supporting papers must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176; Fed.R. Civ.P. 56(c). This principle is applicable even though the pro se complaint and supporting papers are inartfully drawn, *cf. Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652.

*Grear v. Loving*, 538 F.2d 578, 580 (4th Cir. 1976).

▮ Having examined the materials submitted by defendants in support of their summary judgment motions, we, unlike the district court, are not convinced that there are no genuine issues of material facts. The papers supporting defendants Pinkney and Polizzi's motion reveal the following. The report filed on the date of the incident by Lieutenant Rich, one of the prison guards, states that Stringer "refused all orders . . . to move quietly to [a] control cell." It also states that a disciplinary report had been filed against plaintiff by Conkle. At the request of Pinkney, and subsequent to the filing of plaintiff's complaint, a report was filed approximately six months after the event by Conkle. His report, which was attached to defendants' summary judgment motion, states that plaintiff, while being escorted back to his cell following the Committee hearing, tried to unbuckle his security belt, but that Conkle prevented him from doing so. It further states that plaintiff, after being placed behind bars, refused to relinquish his handcuffs and security belt. Lastly, the report indicates that Polizzi, unable to talk plaintiff into giving up these security items, maced Stringer. In his supplemental report dated January 11, 1977, Rich stated that when he went to plaintiff's cell and requested that the handcuffs and security belt be relinquished, Stringer refused. He also stated that Polizzi ordered the use of mace on plaintiff after talking to him for some time "with no positive results." In the affidavits submitted in support of Conkle's motion for summary judgment, Conkle and Rich stated that Stringer's security belt was broken and according to Conkle, "plaintiff was waving it around in his cell." Rich stated merely that the belt "was loose" and "flapping around" and that when the belt was retrieved from plaintiff, he found that it was broken.

An examination of these papers reveals several inconsistencies. No mention of the broken security belt was made in the three reports written by Conkle and Rich which were attached to Pinkney and Polizzi's motion. Moreover, Pinkney's affidavit acknowledges that, contrary to Rich's initial report, no disciplinary report was ever filed against plaintiff as a result of the incident.

In addition to the disagreement over the circumstances that provoked the macing, the affidavits do not disclose why lesser measures could not have been used to subdue Stringer and the extent of the chemical's residual effect on Stringer. As the district court found, plaintiff submitted no opposing affidavits; and he did not specifically deny that he refused to give up the security belt. In his memorandum submitted in opposition to defendants' motions for summary judgment, plaintiff, however, did reiterate his allegations concerning the macing incident. On the basis of the entire record, we find the existence of genuine issues of material facts, and we therefore reverse the district court's order on this issue.

### Count IV: Loss of Personal Property

■ Stringer's remaining claim may be disposed of summarily. In his complaint plaintiff alleged that his personal property, including legal papers, were "lost" during the transfer from Pontiac to Menard and he requested damages for the loss of these items. The district court held that plaintiff did not state a cause of action under 42 U.S.C. § 1983 because he failed to allege that the prison officials intentionally took the property and because he failed to rebut defendants' evidence that a search was made for Stringer's papers both at Menard prison and at Pontiac prison but that no property was found.

We agree with the district court's decision granting summary judgment in favor of defendants on this issue. In *Bonner v. Coughlin*, 545 F.2d 565 (7th Cir. 1976), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978), a prisoner sought damages under section 1983 for the loss of his trial transcript because prison guards negligently left his cell door open after a security search. We held that section 1983 does not provide a remedy for mere negligent acts. To state a cause of action under section 1983, it must be alleged that the guards' actions were either "intentional or in reckless disregard of [plaintiff's] constitutional rights." *Id.* at 567. Stringer alleged that his personal property was "lost."

Such an allegation standing alone is clearly insufficient under *Bonner*. Plaintiff argues, however, that other allegations in the complaint establish reckless conduct on the part of the prison officials. Specifically, plaintiff focuses on the allegations that, despite several requests that his property be delivered to Menard following the transfer on June 25, 1976, no action was taken by defendants until several weeks after his grievance had been considered by the Administrative Review Board on August 5, 1976. An affidavit submitted by defendants states that a search was made for Stringer's papers both at Menard and at Pontiac sometime after August 27, 1976. Based on this two month delay in attempting to locate his property, plaintiff argues that defendants acted in reckless disregard of his constitutional rights. We do not agree. Without more, this conduct does not rise to the level of a deprivation of rights under section 1983. *Kimbrough v. O'Neil*, 545 F.2d 1059 (7th Cir. 1976), upon which plaintiff relies, does not compel a different conclusion. In that case, the prisoner's complaint, liberally construed, alleged that his missing personal property had actually been intentionally taken by a deputy sheriff. *Id.* at 1060. On the basis of the allegations before us, plaintiff's complaint cannot be similarly interpreted.

### Miscellaneous

Defendants argue that the complaint is subject to other deficiencies. First, they maintain that the allegations are insufficient to retain defendants Rowe and Gramley in this suit. The district court found that Stringer's complaint did not "sufficiently allege the personal involvement of defendants Rowe and Gramley in the alleged illegal activities," and thus held that even if Stringer had stated a cause of action which could survive a motion for summary judgment against some of the defendants, their motions to dismiss would still be granted.

■ We disagree with the district court's finding. In *Adams v. Pate*, 445 F.2d 105, 108 (7th Cir. 1971), this court held that

plaintiff must allege "personal involvement or knowledge" on the part of the defendant to state a claim under section 1983 against supervisory personnel. Stringer alleged in his complaint that Rowe, director of the Department of Corrections, concurred with the two decisions of the Administrative Review Board. Gramley, who as transfer coordinator for the Department of Corrections had direct control over prisoner transfers, was alleged to have approved Stringer's transfer without a hearing. It appears in the record that both of these men were aware of plaintiff's claims filed with the Adjustment Review Board. Recognizing that *pro se* complaints must be held to a less stringent standard than formal pleadings drafted by attorneys, we believe that plaintiff's allegations are sufficient to meet the standard set forth in *Adams v. Pate, supra.*

■ Second, defendants argue that plaintiff's request for declaratory relief has become moot by reason of his release from segregation. The record reveals that following his release from segregation, the Administrative Review Board expunged plaintiff's record, thus protecting plaintiff from future prejudice in obtaining parole, work assignments, and transfer to a prison nearer his home. *See Chapman v. Kleindienst,* 507 F.2d 1246, 1248 n. 2 (7th Cir. 1974). The record also shows that Stringer is no longer an inmate either at Menard prison or at Pontiac prison. In light of these facts, on remand the district court should address the issue of whether mootness applies to Stringer's request for declaratory relief. *See Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

■ Finally, it is apparent from the lengthy discussion of issues that this case does not present the more common situation of the clearly frivolous or repetitive prisoner rights case which burdens our judicial system. Although Stringer's complaint was inadequate to state a claim when scrutinized with a highly technical eye, the additional papers filed by the parties raised serious factual disputes. Under such circumstances we believe that the district court, rather than attempting to resolve the case on motion for summary judgment, should have appointed counsel to assist the *pro se* litigant. By appointing counsel in cases such as this one, the district court not only insures that the meritorious claims of a civil rights *pro se* plaintiff are not defeated, but eases the burdens placed both on the district court and on this court when the plaintiff has filed an inartfully drawn and arguably incomplete complaint.

The summary judgment is reversed in part and affirmed in part and the cause is remanded for further proceedings.

## APPENDIX

Ill.Rev.Stat. ch. 38, § 1003–8–7:

\* \* \* \* \* \*

(d) All institutions and facilities of the Adult Division shall establish, subject to the approval of the Director, procedures for hearing disciplinary cases except those that may involve the imposition of disciplinary isolation; the loss of good time credit under Section 3–6–3 or eligibility to earn good time credit; or a change in work, education, or other program assignment of more than 7 days duration.

(e) In disciplinary cases which may involve the imposition of disciplinary isolation, the loss of good time credit or eligibility to earn good time credit, or a change in work, education, or other program assignment of more than 7 days duration, the Director shall establish disciplinary procedures consistent with the following principles:

(1) Any person or persons who initiate a disciplinary charge against a person shall not determine the disposition of the charge. The Director may establish one or more disciplinary boards to hear and determine charges. To the extent possible, a person representing the counseling staff of the institution or facility shall participate in determining the disposition of the disciplinary case.

(2) Any committed person charged with a violation of Department rules of behavior shall be given notice of the charge including a statement of the misconduct alleged and of the rules this conduct is alleged to violate.

(3) Any person charged with a violation of rules is entitled to a hearing on that charge at which time he shall have an opportunity to appear before and address the person or persons deciding the charge.

(4) The person or persons determining the disposition of the charge may also summon to testify any witnesses or other persons with relevant knowledge of the incident. The person charged may be permitted to question any person so summoned.

(5) If the charge is sustained, the person charged is entitled to a written statement of the decision by the persons determining the disposition of the charge which shall include the basis for the decision and the disciplinary action, if any, to be imposed.

(6) A change in work, education, or other program assignment shall not be used for disciplinary purposes without prior review and approval under Section 3–8–3.

AR 804(II)(A):

Division of Responsibility

\* \* \* \* \* \*

3. The Program Team will be responsible for acting promptly on the *minor* Resident Information Reports that concern actions and sanctions not warranting removal from programming or referral to the Adjustment Committee, after interviewing the resident or residents involved. Program Teams shall consist of at least three individuals—a Correctional Officer, an Educator or Work Supervisor, and a Counselor. A simple majority of the committee will be required for any disciplinary action.

4. An Institutional Adjustment Committee must conduct a hearing on all other Resident Information Reports, including those which may result in programmatic removal from the population, demotion in grade, or loss of good time. . . .

AR 804(II)(K):

Procedure to be Followed by Program Team

1. The resident must receive written notice of the facts and alleged charges being presented against him no less than 24 hours prior to the hearing before the Program Team, unless the time limit is knowingly waived in writing by the resident.

2. Under no circumstances may any person who initiated an allegation be allowed to sit on the Program Team hearing that matter.

3. Any resident charged with a violation of rules being heard by the Program Team has a right to appear before and address the Team. The resident may, upon request, be granted reasonable additional time to prepare for the presentation.

4. Because they deal only with minor Resident Information Reports, Program Teams need not hear and deliberate on residents' requests to call witnesses, to obtain inaccessible documentary evidence, to cross-examine a charging officer or to obtain professional or lay assistance in presenting their responses to charges. However, the Program Team itself may, at its own discretion in those instances where required by fundamental fairness, interview witnesses and obtain records relevant to the question of whether or not a resident committed a certain violation.

5. The Program Team is not required to keep any written record of its proceedings, other than the Resident Information Report and the statement of the team's decision or action on the report, copies of which should be placed in the resident's master record file.

6. The resident must be given a brief written statement of the Program Team's decision and of its reasons therefore, as well as its justification for any action taken against the resident because of

the decision, within 72 hours of the occurrence or the discovery of the rule violation.

7. If its decision is adverse to the resident, the Program Team must inform the resident of his right to appeal through the grievance procedure.

8. Actions taken by the Program Team may be one or any combination of the following:
 a. Dismissal of the charge.
 b. Reprimand.
 c. Recommendations for a program change.
 d. Recommendations for a housing change.
 e. Denial of specific privileges.
 f. Referral to the appropriate medical or clinical personnel.

AR 804(II)(B):

Procedure for Hearings before Adjustment Committee

1. The resident must receive written notice of the facts and alleged charges being presented against him no less than 24 hours prior to the hearing before the Adjustment Committee, unless the time limit is knowingly waived in writing by the resident.

2. Under no circumstances may any person who initiated an allegation be allowed to sit on the Adjustment Committee hearing that matter.

3. The notice of charge and date of hearing will be written legibly or typed on a pre-printed form . . provided to staff for this purpose.

4. Pre-printed portions of this form must convey the following information to the resident being charged: that he has a right to appear before the Adjustment Committee and contest the rule violation charge by presenting a written or oral statement or explanation of his actions; that he may present to the committee relevant physical exhibits, such as records or documents; that he has the right to ask that witnesses be interviewed and, if necessary in the committee's judgment, be called to testify by the committee during his hearing; that he may ask the committee to question witnesses along lines suggested by him; that he must indicate in advance of the hearing the witnesses he wishes to have interviewed or called to testify by filling out the appropriate space on this form, tearing it off, and returning it to the committee; that if he is illiterate or seriously handicapped, he may have the assistance of a staff counselor to help him prepare a defense; that he may request a reasonable extension of time to prepare for the hearing; and, that if found guilty of a serious rule violation and found to be a danger to the institutional community, he may be placed in segregation and/or deprived of his current grade and statutory good time credit.

5. Any resident charged with a violation of rules being heard by the Adjustment Committee has a right to appear before and address the Committee. The resident may, upon request, be granted reasonable additional time to prepare for the presentation.

6. The Adjustment Committee has the right to call any witnesses or other persons with relevant knowledge of the incident. *Direct* confrontation and cross examination of the witnesses by the residents are not required. However, the resident may request the Adjustment Committee to interview witnesses with relevant knowledge and pose certain questions to them: such requests shall ordinarily be granted unless found to be excessive or unreasonable. The resident is allowed to ask that witnesses be interviewed and to present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to

institutional safety or correctional goals, and will not extend the hearing beyond all reasonable limits, keeping in mind that the resident does not have the unrestricted right to call witnesses from the institution population. The committee will state, in general terms, its reasons for not interviewing a witness, whether it be for irrelevance, lack of necessity or the hazards presented to institutional security or safety.

7. Residents shall not have a right to either retained or appointed counsel, but where the resident is illiterate, or where the complexity of the issues makes it unlikely that the resident will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should have made available to him the aid of a competent fellow resident designated by the staff, or the aid of a member of the staff.

8. One member of the Adjustment Committee or its permanent secretary will keep a brief written record of all proceedings had before the committee; the written record shall consist of substantial *summaries* of such occurrences as requests, statements or explanations made by residents and/or witnesses before the Committee and the responses and questions of the members of the Committee (see example, Attachment C).

9. The resident must be given the written statement, signed by the Chairman, of the evidence relied upon by the majority of the Committee and the specific disciplinary action taken, as well as the reasons for disciplinary action. If personal or institutional safety is involved, this statement may properly exclude certain items of evidence, but the statement should then indicate the fact of the omission. The statement of decision should include, whenever appropriate, a short explanation of why information purporting to exonerate the resident was discounted, if it was discounted. It will not be sufficient for the committee's decision to simply adopt and copy the exact wording of the Resident Information Report. The resident's copy of the Committee's statement of decision must be given to him either immediately after the hearing or within 24 hours after the decision is made.

10. Actions taken by the Adjustment Committee may be one or any combination of the following:

 a. Dismissal of the charge.

 b. Recommendation to the Chief Administrative Officer for demotion in grade.

 c. Recommendation for a program change.

 d. Recommendation for a housing change or transfer.

 e. Transfer to the Segregation Unit.

 f. Recommendation to the Director of Corrections, via the Chief Administrative Officer and the Administrator, Adult Institutions, for revocation of the resident's good time credit.

11. If the decision of the Adjustment Committee is adverse to the resident, the Adjustment Committee must inform the resident of his right to appeal through the grievance procedure.

12. A copy of the Resident Information Report, including a report of the action taken, must be filed with the Chief Administrative Officer of the institution by the Chairman of the Adjustment Committee within 72 hours of the occurrence or the discovery of the rule violation. The report is then to be placed in the resident's master record file.

13. The Chief Administrative Officer or his designate shall automatically review all decisions which result in serious consequences to a resident, such as loss of good time or pro-

grammatic removal from the resident population. When reviewing such reports, the Chief Administrative Officer or the Administrator, Adult Institutions may take the following actions: 1) confirm the decision; 2) order further or new proceedings; or 3) suspend or overturn the decision. The Chief Administrative Officer of the Administrator, Adult Institutions shall not increase the sanctions imposed.

14. If a recommendation for demotion in grade is made, a copy of the Adjustment Committee's recommendation, and a notation of the Chief Administrative Officer's decision shall be given to the resident at the time that the demotion action, with the resulting loss of privileges, is effected.

15. If a recommendation for loss or restoration of statutory good time is made, a copy of the Adjustment Committee's recommendations and a notation of the Director's action shall be given to the resident.

AR 819:

I. POLICY OF DEPARTMENT: To establish procedures through which a resident may request, at any time, an institutional transfer, or institutional staff may recommend the transfer of a resident.

II. EXPLANATION:

A. The transfer of a resident may be requested either by the resident or recommended by a member of the institutional staff. In either case, the request or recommendation will be submitted to the Clinical Services Supervisor, who will be responsible for the preparation of a professional report detailing the resident's adjustment and program involvement at that facility and the reasons why the transfer is being considered. The report shall also note the names and current institutional locations of any other residents from whom the resident must be kept separate, and

shall indicate the date of the resident's next parole hearing. This report will ordinarily be prepared by the resident's correctional counselor.

B. A copy of the Clinical Services' report shall be referred to the Institutional Assignment Committee and a hearing scheduled to review the proposed transfer. At this hearing, the written rationale for the transfer shall be reviewed with the resident, and he or she shall be allowed to present information and/or evidence which would tend to support or refute the transfer.

C. As part of the Assignment Committee review, a check shall be made with the Medical Unit Administrator to determine that all pertinent medical objectives have been achieved and that there are no dental prosthesis pending, consultant visits planned, or necessary medical treatment that has not been accomplished. All scheduled medical treatment, either in available institution or community medical facilities, shall be completed promptly prior to transfer. Any exceptions to this section must be approved in advance by the Medical Services Administrator and the Coordinator of Program Services, Adult Division.

D. If the Assignment Committee recommends transfer and the recommendation is approved by the Chief Administrative Officer or his designee, the complete rationale for the proposed transfer shall then be forwarded to the Transfer Coordinator, together with four copies of the completed transfer order.

E. The Transfer Coordinator may:

1. Approve the transfer request.

2. Approve an alternate placement, in consultation with the Chief Administrative Officer of the transferring institution, or his designee.

3. Deny the request, accompanying the denial with a written explanation of the reasons for the action.

F. A complete record of any institutional transfer and the reasons for do-

ing so shall be included in the resident's master record file.