**SHANGO (Cleve Heidelberg, Jr.), et al., Plaintiffs,**

v.

**Mary JURICH, et al., Defendants.**

Nos. 74 C 3598, 76 C 3068, 76 C 3379 and 77 C 103.

United States District Court, N. D. Illinois, E. D.

July 13, 1981.

George J. Casson, Jr., Bell, Boyd & Lloyd, Chicago, Ill., for plaintiffs.

Victor Yipp, Theresa M. McGrew, Robert Connor, Asst. Attys. Gen., Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiff Cleve Heidelberg, Jr. ("Shango," the name by which plaintiff is known in the prison community) initially filed a *pro se* motion for injunctive relief against various officials of the Illinois correctional system.[1] At the Court's request George Casson, Jr., the volunteer counsel acting for the plaintiff class in the consolidated action, agreed to represent Shango in the injunction proceedings and filed a supplemental complaint in his behalf against Gayle Franzen as Director of the Illinois Department of Corrections (the "Department") and Richard De-Robertis as Stateville's Warden, focusing Shango's claims in relation to currently applicable legal standards.[2]

That supplemental complaint claims essentially that (1) disciplinary charges against Shango were initiated because Shango refused to reveal confidential information as to other Stateville residents, given to Shango in the course of his activities as a resident legal clerk and as a "jailhouse lawyer," (2) the disciplinary proceedings stemming from those charges violated

Shango's rights to due process, (3) Shango was transferred to the segregation unit at Menard for the same reasons referred to earlier in this sentence and (4) the conditions of Shango's imprisonment at Menard and the seizure of Shango's personal property there constitute cruel and unusual punishment.

This Court denied Shango's initial motion for a temporary restraining order but scheduled and conducted a two-day evidentiary hearing on Shango's motion for preliminary injunctive relief. Both pre-hearing and post-hearing briefs have been filed by the parties. Although they differ sharply on the proper result, there is no disagreement as to the standards that Shango must meet, as recently reiterated by our Court of Appeals in *O'Connor v. Board of Education*, 645 F.2d 578, 580 (7th Cir. 1981):

1. Shango has no adequate remedy at law and will be irreparably harmed if the injunction does not issue.

2. Threatened injury to Shango outweighs the threatened harm the injunction may inflict on defendants.

3. Shango has at least a reasonable likelihood of success on the merits.

4. Granting a preliminary injunction will not disserve the public interest.

For the reasons stated in this memorandum opinion and order, the Court finds that Shango has sustained his burden only in limited respects and is entitled to some but not all of the preliminary injunctive relief he seeks.

*Facts*

In July 1980 Shango was serving a long-term sentence at Stateville. For a number of years Shango has served as a "jailhouse

1. This action, 74 C 3598, is one of a group of consolidated individual and class actions of varying ages challenging various aspects of the law library system at Stateville Correctional Center ("Stateville"). Since the consolidated actions were reassigned to this Court the parties have, with the assistance of the Court, reached agreement as to a proposed consent decree resolving many of the substantive issues in that respect. Notice and opportunity for hearing are about to be given to members of the class, to be followed by entry of the decree if it then appears to be fair, reasonable and

adequate under all the circumstances. Shango's present motion raises other individual claims of a current origin and may appropriately be considered independently of the proposed consent decree.

2. This Court extends special thanks to Mr. Casson for the vigorous *pro bono publico* representation he has afforded Shango. It has proved of inestimable value to his client and to the Court in resolving the issues posed by the motion for injunctive relief.

lawyer," assisting other Stateville residents with a large number of civil rights actions, internal grievance proceedings, criminal appears and habeas corpus petitions (Tr. 20–37, 67–69, 263–64).[3] During portions of that period, including several months immediately before the events triggering the current motion, Shango also worked as a clerk in the Stateville law library (Tr. 20–21).

On July 14, 1980 another Stateville resident, Stephen Edwards, came to the office of Lt. Ulsey Price, a Stateville internal investigator, and charged that at some time during the month of June 1980 Shango had engaged in homosexual activity with Edwards, having paid another resident to force Edwards to do so (Tr. 266–72). At Lt. Price's request, Edwards took a polygraph examination (Tr. 272), and upon being advised of the results of that examination Lt. Price caused Shango to be placed on investigative status (Tr. 272–73) (this caused Shango to be transferred to confinement in the Stateville Investigation Segregation Unit).

Although Shango charges that the entire episode stemmed from defendants' desire to harass Shango for his jailhouse lawyer and resident legal clerk activities, the Court finds the evidence insufficient to establish that claim at this stage of the proceedings. Lt. Price knew Shango by that name as having carried out such functions, but Lt. Price, Warden DeRobertis and Edwards all testified that no correctional authority had initiated Edwards' coming forward to Lt. Price (Tr. 189–90, 267, 342). Lt. Price and the Warden testified that Lt. Price was not ordered to investigate Shango by the correctional authorities (Tr. 189, 274). Equally significantly, Lt. Price testified that he sim-

ply did not know the person charged as "Cleve Heidelberg, Jr." to be the same as the person he had heard of but did not know as "Shango" (Tr. 319). Investigator Alfred Faro of the Department's Internal Affairs division, who was the officer actively involved in the investigation, testified that he too was then unaware of Shango's activities as a jailhouse lawyer or legal clerk (Tr. 324–25).

Almost immediately after Shango's transfer to the segregation unit Shango objected to the Stateville Adjustment Committee in accordance with the Department's Administrative Regulations (cited "AR"). Also purportedly in accordance with the ARs, the Adjustment Committee conducted a "hearing," which in fact consisted only of reading the Resident Disciplinary Report (colloquially "ticket") written up by Lt. Price (Tr. 54–59). It rejected Shango's demands for a filing of specific charges, polygraph examinations and release from segregation "as per Lt. Price's request," and it upheld Shango's placement in disciplinary status (Pl. Ex. 3). Because AR 804.II.J.1 provides that a resident's confinement in segregation pending investigation requires the same procedural safeguards as a resident's disciplinary placement in segregation, that "hearing" violated the Administrative Regulations in at least the following respects:

(1) Lt. Price's ticket did not "provide [Shango] with as much information as possible regarding the incident" with Edwards (as required by AR 804.II.J.2). It did not adequately inform Shango of the nature of the charge or the date, time and place of the alleged incident, effectively depriving Shango of the opportunity to meet the charge.[4]

---

**3.** Shango has received substantial training from workshops and seminars, as well as learning by doing. From his uncontradicted testimony it appears that his training and experience are more extensive than those of any other Stateville resident (Tr. 40–41).

**4.** Lt. Price's ticket (Pl. Ex. 25) described the investigation as "being conducted into charges of extorting sexual assault and trafficking" and stated the "date and time of observation" as about 4:50 p. m. July 14, 1980. It developed from Lt. Price's testimony that his practice in writing up tickets was to fill in the latter blank

with the date and time of *his report* and not of the alleged *offense* (the Adjustment Committee summary of July 16, which upheld Shango's placement in segregation, thus also referred to the "date and time of violation" as July 14, 1980 at 4:30 p. m.). Shango, reading the ticket with the same normal meaning, wrote the Adjustment Committee on July 16 (Pl. Ex. 2) that at the listed time he was under supervision of a named officer in the yard (that was the library's assigned period for yard recreation) and that he was taken back to the library at the conclusion of the yard period—hence he could not have engaged in the alleged acts. Resi-

(2) There was no real hearing of any kind before the Adjustment Committee, which (in a two-minute proceeding) simply read Lt. Price's ticket and, despite Shango's objections and attempted defense, upheld the segregation on investigative status without any stated reason except to refer to Lt. Price's ticket.

On July 23, 1980 Lt. Price interviewed Shango for the first time, informed him of the Edwards charges and offered him the opportunity to take a polygraph examination to rebut the claims (Tr. 62–64, 277–81). Though the parties agree that Shango refused to take the polygraph examination, there is a total conflict in the testimony as to whether—as Shango claims and Lt. Price denies—the offer was linked to proposed questioning as to other inmates Shango was assisting and as to other resident legal clerks and jailhouse lawyers (Tr. 66–69, 282). That dispute in testimony also exists as to whether the same subject matter was discussed during the July 24 interview of Shango by Investigator Alfred Faro of the Internal Affairs Office of the Department of Corrections (Tr. 74–75, 324–26). Because the Court has resolved the "hearing" issues on due process grounds, it is not called on to make findings of fact as to that contested area of testimony.

On July 25, 1980 Shango was served with a new ticket prepared by Lt. Price (Pl. Ex. 6), this one charging him with violations of ARs against "engaging with others in or pressuring others to engage in any unnatural sexual activity" and "violating the general laws of the State or Federal government" (the latter charge referring to the state statute prohibiting "deviate sexual assault"). It charged (a literal transcription):

> On July 24, 1980 a copy of a polygraph examination taken by resident Stephen Edwards indicated, he was telling the truth, when he stated that during the month of June 1980 on at least one occasion you paid another resident to force Edwards to have a unnatural sex act with you.... You were given an opportunity

to take a polygraph examination on these charges. You Heidelberg decline therefore you are so charged.

Lt. Price did not state either in his report or his interview with Shango (and therefore Shango was not advised) that (1) Lt. Price's check of inmate Edwards' trust fund records did not implicate Shango in any way (Tr. 305) or (2) Lt. Price's interviews of other inmates also did not implicate Shango in any way (Tr. 306–7).

Shango promptly exercised his right to appear before the Adjustment Committee, where he was asked to and did waive the 24-hour notice requirement (Tr. 84–85). At the "hearing" the ticket was read to him, with no witnesses and no evidence being offered (Tr. 85–86). Shango asked for specifics (such as the date, time, who the other resident allegedly was and where the alleged incident occurred) to permit him to offer a defense, explaining that his movements within the institution are always controlled and that such particulars could enable him to provide facts in contradiction to the charge (Tr. 86–87). Shango stated that he was not a homosexual and had had no sexual relationships with Edwards or any other man, so that the charges were untrue (Tr. 87–88). His requests for access to the polygraph examination and statements of witnesses were refused, the Administrative Committee stating that they had nothing before them except the ticket itself—neither the "investigation" nor the "official results of the polygraph examination" referred to in the ticket (Tr. 88–93).

After its session, which occupied 20–25 minutes (Tr. 90), the Adjustment Committee excused Shango, then called him back within three minutes (Tr. 94) and provided him with the Adjustment Committee Summary (Pl. Ex. 7). It stated as the "Record of Proceedings":

> Resident states that he is not guilty, denies any homosexual activities, questions when and where incident allegedly occurred. Refused to take polygraph test

---

dents are afforded only limited rights to meet charges against them in all events, and Lt. Price's practice compounds the problem by de-

priving them of even that ability to be apprised of exactly what they are accused to enable them to defend against the charges.

because he was not supplied with specific detail concerned alleged incident.

It stated as its "Basis for Decision/Evidence Relied upon":

Interview with resident. Adjustment Committee is relying on accuracy of polygraph examination and Internal Affairs investigation.

As a result of that decision Shango was placed in "C" grade for one year (involving a loss of status and the ability to earn good time during that period), forfeited one year of good time and was committed to one year's segregation effective July 14, 1980. Shango exhausted his internal administrative remedies from that decision, including challenging its procedural deficiencies, without success (Tr. 96–111; the final decision of the Administrative Review Board, Pl. Ex. 12, was rendered September 11, 1980). Shango has in fact been confined in segregation status since July 14, 1980 except during the preliminary injunction hearing in this action (Tr. 95–96).

In the meantime, on August 8, 1980 Investigator Faro testified that he confronted Shango with a charge that he had been in possession of a zip gun in his cell in 1978, based on information received from inmate Edwards (Tr. 326–27). According to Shango, the claim was that he had been in a conspiracy with others to bring weapons into the institution (Tr. 124). In any event, each of them agreed that Faro asked and Shango refused a polygraph examination on the subject of weapons (Tr. 124, 327). Shango claimed that he didn't know what Faro was talking about regarding Shango's own activities, and that his refusal to respond or to take a polygraph examination was on the basis that if he *had* any knowledge about weapons involving other inmates it had been gained through his legal work and was therefore confidential (essentially claiming a kind of "lawyer-client" privilege) (Tr. 124). Shango claimed that defendants DeRobertis (in September 1980) (Tr. 125) and Lane (in October 1980) (Tr. 126) had continued to press for the same information, offering to make things easier if he cooperated. Assistant Director Lane

did not testify at the hearing, but Warden DeRobertis testified (Tr. 155) that he had exchanged a few minutes' conversation with Shango during which the Warden stated his concern regarding manufacturing weapons and Shango had responded that:

no matter what I [DeRobertis] do I would not be able to prove that he [Shango] was involved in the manufacturing of weapons ... to know is one thing, to show is another.

Warden DeRobertis also testified (Tr. 159, 164–66) that in his opinion Shango was a threat to the safety of the institution, based on information that DeRobertis had received in the spring of the year about Shango's membership in an organization that DeRobertis characterized as mercenary and anarchist in nature, manufacturing homemade weapons for sale to street gang members for a price. Based on that opinion DeRobertis decided to recommend transferring Shango out of Stateville (Tr. 169). Transfer was approved by Assistant Director Lane (Tr. 232), and at 4:30 or 5 a. m. October 30, 1980 Shango was transferred to Menard (Tr. 135–36), where he was placed in segregation. No notice or hearing in accordance with AR 819 or 820 (copies of which are attached) was provided Shango either before or after that transfer (Tr. 138, 220).

While at Menard, where Shango has since been confined except for the brief period of the hearing in this action, the living conditions to which he was subjected were originally intolerable (Tr. 221–22). After Shango moved for a temporary restraining order in this action the conditions were improved to some extent (Tr. 222–23), but then Shango was transferred to another cell with uninhabitable conditions (Tr. 223). Because of the Court's decision as to the invalidity of the transfer to Menard, it is unnecessary for purposes of this motion to decide Shango's claim that the conditions of his confinement violate the Eighth Amendment's prohibition against cruel and unusual punishment—but the uncontradicted record on that score gives an appalling picture of those conditions.[5]

---

5. See our Court of Appeals' decision in *Chavis v. Rowe*, 643 F.2d 1281, 1291–92 (7th Cir. 1981), upholding highly similar claims stemming from confinement at the same institution

In connection with Shango's transfer to Menard substantial amounts of his personal property were taken from him (Tr. 138–39, 209–10; Pl. Ex. 19) and have never been returned (Tr. 139–40, 210–18). That unreturned property consists substantially though not entirely of law books and papers, personal writings, political material, clothing and personal effects and other property that could not conceivably be characterized as posing a threat to institutional safety (Tr. 211–15). No explanation or justification for this conduct was given by defendants at the hearing, and the strong inference is that no attention was paid to Shango's rights in this respect (Tr. 216–18). It appears highly likely that the material may have been lost or destroyed.

### Resident Legal Clerk and Jailhouse Lawyer Issues

In substantive terms Shango's principal complaint has been that defendants' actions against him have constituted harassment or retaliation because he has refused to reveal information confided to him as resident legal clerk or jailhouse lawyer for other Stateville residents. Were that the case he might claim the protection of such cases as *Buise v. Hudkins,* 584 F.2d 223, 227–31 (7th Cir. 1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466.

■ But this Court has found that the evidence is simply insufficient to establish that charge. In preliminary injunction terms Shango has not demonstrated a reasonable likelihood of success on the merits of that claim. Though Shango claims attempted intimidation of other jailhouse lawyers and resident legal clerks as well, no evidence supports that charge, and Shango's failure of proof on his own claim would in any case pose standing problems for his attempted assertion of the rights of other jailhouse lawyers and legal clerks. Contrast *Buise,* 584 F.2d at 227 and *Johnson v. Avery,* 393 U.S. 483, 487, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969) (granting relief to the jailhouse lawyer himself because his activi-

ties protected the rights of his fellow inmates to receive his services).

In summary Shango has not met the burden of demonstrating a right to relief on the issues dealing with the rights of legal clerks and jailhouse lawyers. It is therefore unnecessary to deal with the related questions Shango seeks to raise in this area, such as the availability of a "lawyer-client" type privilege for communications to and from a resident legal clerk or jailhouse lawyer.

### Due Process Claims

#### 1. Disciplinary Proceedings

■ Prison disciplinary proceedings that can result in assignment to segregation and the loss of statutory good-time credit implicate the deprivation of "liberty" in Fourteenth Amendment terms. *Wolff v. McDonnell,* 418 U.S. 539, 556–58, 94 S.Ct. 2963, 2974–2975, 41 L.Ed.2d 935 (1974). Accordingly that Amendment's Due Process Clause guarantees a prisoner certain procedural protections. Those include advance written notice of the charges and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 563–66, 94 S.Ct. at 2978–2979; *Hayes v. Walker,* 555 F.2d 625, 631–33 (7th Cir. 1977), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *Chavis v. Rowe,* 643 F.2d 1281, 1286–87 (7th Cir. 1981). They also require *Brady v. Maryland* type disclosure of exculpatory evidence to the inmate. *Chavis,* 643 F.2d at 1285–86. It is not enough for the panel simply to have the exculpatory material before it, nor is it enough for the panel to state simply that its decision was based on the investigative report or disciplinary report. *Id.* at 1285–87.

■ Here Shango was subjected to two such disciplinary proceedings, one placing him in segregation on investigative status and the other imposing substantial discipline. In each instance defendants purported to provide him with a hearing in accord-

as the basis for a damage award grounded on Eighth Amendment violations. That decision does not appear to have been impacted by the later Supreme Court decision in *Rhodes v. Chapman,* —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

ance with AR 804, a regulation that—had it been followed in compliance with the cases cited in this section—would have comported with due process requirements. But because of the substantial deficiencies referred to in the "Facts" section of this opinion as to each "hearing," Shango's rights to due process were violated in each proceeding.

### 2. Transfer to Menard

This Court's determination that plaintiff has not established a reasonable probability of success on his harassment-retaliation claim also extends to his transfer to Menard. Shango therefore cannot derive comfort from the decisions like *Buise*, 584 F.2d at 227–32, that include interprison transfers among the prohibited punitive or retaliatory measures in response to the exercise of protected rights. Accordingly the case must be considered at this stage on the basis that Warden DeRobertis had a good faith belief that Shango posed a threat to the safety of Stateville.

Nonetheless due process is Shango's due in connection with the transfer to Menard if there exists a Fourteenth Amendment liberty interest that has "its roots in state law," under the principles of *Meachum v. Fano*, 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976). Prison regulations can thus create justifiable expectations on the part of inmates, establishing a liberty interest in remaining at one prison. True enough *Chavis*, 643 F.2d at 1290, stated that the Department's "regulations do not recognize any right on the part of the prisoner to serve in a particular institution." However, justifiable expectations and the requisite liberty interest can equally well be established by an inmate's being entitled to remain at one prison unless the State follows

its own *procedural* requirements of a hearing.[6] Indeed, if the State's regulations *do* require a hearing as a condition of a transfer, its failure to provide one to Shango would also violate his rights under the Fourteenth Amendment's Equal Protection Clause. *Stringer v. Rowe*, 616 F.2d 993, 998 (7th Cir. 1980).

To comply with the Illinois Correctional Code (Ill.Rev.Stat. ch. 38, § 1003) the ARs include two sections, AR 819 and 820, dealing respectively with Institutional Transfers and Emergency Transfers. AR 819.-II.A specifically *requires* that a pre-transfer hearing be provided an inmate before the Institutional Assignment Committee. AR 820.II.C recognizes the obvious fact that emergencies (affecting either the institution or the inmate) may preclude a *pre*-transfer hearing:

> When a transfer must be effected on an emergency basis in order to maintain the security of the institution or for the safety of the resident, the resident may be transferred to the receiving institution as soon as verbal or written permission is obtained.

But in that event AR 820.II.C mandates a prompt *post*-transfer hearing (emphasis added):

> If time permits, the resident should receive a hearing with the sending institution Assignment Committee before the transfer is effected. However, if this cannot be accomplished, the resident *must* receive a hearing by the Institutional Assignment Committee at the receiving institution within 10 days of his arrival at that facility.

Indeed the hearing is viewed of such importance that (*id.*):

> If the resident is transferred to other than a state correctional center, the send-

---

**6.** It may be assumed for this purpose that the current version of the Department's Administrative Regulations, like the earlier version considered in *Chavis*, "establish procedures for the exercise of discretion, but they do not limit the decision to transfer to any particular reason." *Chavis*, 643 F.2d at 1290. Nonetheless the very facts that they specifically require a hearing, and that at the hearing "the reasons for the transfer shall be reviewed with the resident and he/she will be allowed to present information

and/or evidence which would tend to support or refute the transfer" (AR 819.II.A; *accord*, AR 820.II.C.1), make the *denial* of that hearing itself a violation of a liberty interest. To argue that because the transfers are entrusted to the officials' discretion the lack of a hearing is therefore non-prejudicial is to label both the regulations and the "hearing" a sham—to "keep the word of promise to our ear and break it to our hope." Shakespeare, *Macbeth*, Act V, Scene 7, lines 50–51.

ing institution's Assignment Committee will travel to the place of custody to hold the hearing within the 10-day limit.

In response defendants can only point to a saving clause in Paragraph II.F of each of ARs 819 and 820:

Nothing in this regulation should be construed to mean that a non-disciplinary transfer may not be made without a hearing when it is in the best interest of a resident or the Department of Corrections.

They characterize Shango's transfer to Menard by a term unknown to their own regulations—an "administrative transfer" as to which no hearing whatever is required.

That reading is impermissible. It typifies the kind of unwillingness to turn square corners on the part of the State's correctional officials that has produced and continues to produce such cases as *Carroll, Hayes, Buise, Stringer* and most recently *Chavis.* If the saving clause were given the meaning defendants assert,[7] the exception would swallow up the rule. Residents would be entitled to hearings under AR 820 in the case of transfers "on an *emergency* basis in order to maintain the security of the institution" [8] but would *not* be entitled to hearings under AR 819 for *non-emergency* transfers for precisely the same security reasons.[9] That absurd construction would do violence to common sense and to the plain meaning of the ARs.

■ Accordingly the Court concludes that AR 819 applies to non-emergency interprison transfers such as Shango's in this

case and requires a hearing before such a transfer may be made (if the transfer were somehow viewed as "emergency" a post-transfer hearing would have been required by AR 820, and that was not done either). That regulation brings into play the principles stated in the second paragraph of this section. Consequently the failure to have given Shango the hearing to which he was entitled violated his Fourteenth Amendment rights on two grounds—due process and equal protection.

3. *Seizure of Shango's Property*

■ Both the preceding sections have dealt with the infringement of Shango's *liberty* without due process of law. Seizure of and failure to return his personal effects have unconstitutionally deprived him of *property* without due process. *Carroll v. Sielaff,* 514 F.2d 415, 417 (7th Cir. 1975). That is so whether or not the seizure was, as Shango charges but as this Court has not found, motivated by the desire to harass and frustrate his activities in assisting other inmates in their desired access to the Courts.

Defendants have filed extensive memoranda, both pre- and post-hearing, in this case. Yet they have not even addressed themselves briefly to this issue, just as they failed to adduce any evidence on the subject at the hearing. It apparently does not strike defendants as serious to have taken perfectly innocuous personal property from an individual without a shadow of justification. This Court need scarcely state its views on such an attitude and such conduct.[10]

---

7. In any case the facts before the Court require a finding that Shango's transfer to Menard could scarcely be termed "non-disciplinary." It was specifically predicated on his claimed conduct in serious violation of prison regulations (even apart from the fact that it moved him to an institution where he was subjected to adverse living conditions and to the loss of substantial personal property).

8. AR 820.II.C says "the resident *must* receive a hearing by the Institutional Assignment Committee at the receiving institution within ten days of his arrival at that facility" if time does not permit a *pre*-transfer hearing from the corresponding Committee at the sending institution.

9. On Warden DeRobertis' own statement (Tr. 159, 164–66, Pl. Ex. 24) the adverse information asserted as the basis for transferring Shango was known to him in the *spring* of 1980. Investigator Faro charged Shango with such activity in early *August* 1980. Under no reasonable use of the term then can an *October 30, 1980* transfer—months later—be characterized as an "emergency."

10. As Justice White, speaking for the Court, stated eloquently in *Wolff*, 418 U.S. at 555–56, 94 S.Ct. at 2974:

But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly

*Shango's Remedy*

All of the foregoing discussion demonstrates that Shango has substantially more than the necessary "reasonable likelihood of success on the merits." Shango's continued confinement at Menard represents irreparable harm on the facts in the record, and his remedy at law is certainly inadequate. Where as here defendants' actions are unconstitutional, the injury to Shango must by definition outweigh any harm the undoing of those actions may inflict on defendants. Finally it is a contradiction in terms to say that vindicating due process rights will "disserve the public interest."

Accordingly Shango has met the requirements for preliminary injunctive relief. Defendants are ordered forthwith:

(1) to return Shango to Stateville Correctional Center and place him in nonsegregation status there;

(2) to restore to Shango the forfeited one year of good time and to credit to Shango the good time that would have been earned during the year that he has been placed in "C" grade without due process of law; and

(3) to return to Shango all his personal property taken from him at Menard.

Because Shango has already suffered the segregated status to which he was wrongfully committed by defendants, defendants will not be permitted to institute new proceedings based on the same claimed conduct that served as the alleged grounds for such discipline.[11] Inasmuch as Shango has brought this action in forma pauperis, this Court issues the foregoing preliminary injunction without requiring that Shango give any security under Fed.R.Civ.P. 65(c).

stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.

11. This Court expresses no opinion as to whether a determination could properly now be made, if the requirements of due process were scrupulously adhered to, that the safety of Stateville requires Shango's transfer. At this point the alleged information on which the original decision was made is even more stale, and any proposed new proceeding would of course have to be scrutinized with care to make sure it was not really retaliatory for either Shango's having brought this action or Shango's jailhouse lawyering or both.