**Johnny SMITH, et al., on behalf of a class of similarly situated individuals, Plaintiffs,**

**v.**

**James W. FAIRMAN, et al., Defendants.**

**No. 80–2076.**

United States District Court, C. D. Illinois.

Nov. 3, 1981.

Jerold S. Solovy, William D. Heinz and Christopher L. Varner, Jenner & Block, Chicago, Ill., for plaintiffs.

William Sullivan, Asst. Atty. Gen., Chicago, Ill., Suzan Sutherland, Asst. Atty. Gen., Springfield, Ill., for defendants.

Thomas Y. Davies, Chicago, Ill., for amicus curiae, Chicago Lawyers' Committee for Civil Rights Under Law and Chicago Council for Lawyers.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM OPINION AND FINAL ORDER

BAKER, District Judge.

The plaintiff, Johnny Smith, is an indigent prisoner at the Pontiac Correctional Center, a penitentiary operated by the Department of Corrections of the State of Illinois. He seeks only injunctive relief against the defendants.

The essence of the plaintiff's claims is that he has been deprived of his rights under the eighth amendment to the Constitution as it applies to the States under the fourteenth amendment by being subjected to cruel and unusual punishment arising from the overcrowded conditions or "double celling" practices at Pontiac. Smith also claims that the defendants, by ordering Smith's confinement in a double occupancy cell, have deliberately refused him necessary medical treatment and thereby subjected him to cruel and unusual punishment.

Relief is sought under the provisions of 42 U.S.C. § 1983. Jurisdiction is based upon 28 U.S.C. § 1343(3).

### I

This case began as eight separate actions by indigent Pontiac inmates for equitable and declaratory relief and for money damages. The cases were consolidated for ease of handling and judicial economy. A preliminary injunction was issued by the court on August 14, 1980 commanding the defendants to place the eight individual plaintiffs in single occupancy cells in the general prison population.

Thereafter, on October 30, 1980, pursuant to Fed.R.Civ.P. 23(b)(2), the court allowed the plaintiffs' motion to proceed as a class identified as:

"All present and future inmates of the Pontiac Correctional Center who are,

have been, or will be punished for refusing to accept a double cell."

The plaintiff, Johnny Smith, moved, pursuant to Fed.R.Civ.P. 42(b) for a separate trial on Count IV of the amended complaint and sought injunctive relief only and at the same time moved to strike the defendants' demand for a jury trial as to that count. Smith's motion for severance of Count IV and for a separate trial was allowed and, after briefing and argument, the motion to strike the defendants' jury demand was allowed on April 3, 1981.

The case proceeded to trial before the court on April 14, 1981 and the testimony of twenty-three witnesses was presented over a period of nine days of trial. Sixty-two exhibits were received and considered. The court also toured the prison, heard three additional days of testimony, and received fifty-two exhibits in connection with the proceedings for a preliminary injunction. That evidence is considered together with all the other evidence in the case pursuant to Fed.R.Civ.P. 65(a)(2).

The court heard testimony from inmates, from correctional officers, from experienced corrections administrators and penologists, from psychiatrists and other physicians experienced with medical problems in prison administration, and from clinical psychologists and social workers who deal with inmates and prison programs.

### II

The Pontiac Correctional Center is a maximum security penitentiary. It houses inmates who have been convicted of felonies involving violence and threat to human life. Many inmates are serving sentences longer than ten years. All of them are committed for extended periods of incarceration.

The prison was constructed, according to Warden James W. Fairman, in 1871 and was built to accommodate a capacity of 1,200 prisoners. At the time of the hearing on the merits in 1981 the total population of

188

the prison was 1,918 inmates.[1] One thousand six hundred twenty-two (1622) were inside the walls in the maximum security unit and 296 were single celled in the medium security unit outside the prison walls.

Pontiac has three cellblocks. They are the North, South and West cellblocks. There are a total of 1,272 cells inside the prison of which approximately fifty are uninhabitable due to defective lighting, plumbing or locking systems.[2]

Assistant Warden Wright divided the total population of 1,893 inmates at Pontiac as of March 29, 1981 into categories: 1,110 were assigned to work or school programs; 210 were in segregation; 230 were in protective custody; and 303 were unassigned to any job or program. Warden Fairman testified that as of April 24, 1981 there were 600 inmates in the West cellhouse and 410 inmates in the South cellhouse. In the North cellhouse there were 250 inmates in segregation and fifty-two inmates in the protective custody unit. Warden Fairman testified further that there were 146 inmates in the West cellhouse in protective units. One hundred seventy-two (172) of the inmates in the South cellhouse were in protective custody and nineteen inmates were in an orientation status, Warden Fairman said.[3]

As near as I am able to determine from the evidence, there are 1622 inmates inside the walls with approximately 1220 cells to house them. Six hundred thirty-nine (639) of the inmates are single celled for segregation or protective custody or orientation reasons which leaves 983 inmates to be housed in 581 cells. That means that over 56% of the inmates at Pontiac are double celled, with the alternative being segregation or protective custody.

III

The West cellhouse is a concrete block structure with ten tiers of cells with forty-two cells per tier. The outer walls have large glass window areas and the tiers of cells back up to each other so that the front of each cell is a steel barred gate that opens onto a gallery facing the windows. The cells, as measured by the court, are 75 inches by 124 inches, or 64.5 square feet. The cells are slightly in excess of eight feet in height.

The West cellhouse has thirty-two showers and some inmates report that they are able to take showers daily while others are able to take showers three times a week. The floors of the cells are poured concrete and the walls are concrete block. Each cell contains a sink; a sanitary stool; two fixed beds, welded bunk fashion or bolted to the wall; and a chest of drawers or cardboard boxes or both for clothing and personal belongings. Each inmate in the general population is allowed to possess twenty-five books, twelve records and electronic equipment such as a tape player, a radio, or a television set. The equipage in a cell occupies so much of the available floor space that generally the prisoners in a double cell are left with approximately nine square feet for standing room. One prisoner described the available open space in his cell as an area about one and a half feet wide by four feet long.

The West cellhouse, when it was examined by the court, and as uniformly reported by the witnesses, appeared to be fairly clean and neat and the individual cells showed good housekeeping practices. Inmates are able to send their laundry out once every two weeks but most inmates do

1. Laurel Rands, Deputy Director of Policy Development of the Department of Corrections, testified that prison population in 1973 in Illinois was 5,900 and in 1980 had advanced to 12,200. The projections for 1984 are that there will be 16,000 inmates in the Department of Corrections. That is a 31% increase which can only aggravate and certainly will not alleviate the physical conditions at Pontiac.

2. At the time of the hearing on the motion for preliminary injunction, 272 of the cells were uninhabitable. Prelim.Inj.R. at 299.

3. According to Warden Fairman that would make the total inmate population inside the walls, as of the time he testified, 1649. I cannot explain the discrepancy between Mr. Fairman's and Mr. Wright's testimony on population.

not send out the laundry because it comes back damaged or not at all. Instead, the inmates do their laundry in the cells in buckets or in the toilets or, when permitted, in the showers.

The South cellhouse is constructed in a manner similar to the West cellhouse except that there are eight tiers of cells with fifty-two cells in each tier. The cells in the South cellhouse are much the same as that in the West except that they are slightly smaller. They measure 64 inches by 124.5 inches or 55.3 square feet and contain the same equipage as is found in the West cellhouse. The South cellhouse has forty showers and inmates are able to take a shower three times a week. The South cellhouse appeared to the court to be fairly clean and the cells again appeared to be well taken care of. That also was the uniform observation of the witnesses.

The North cellhouse is of similar construction to the other two and has six tiers of cells with fifty-two cells in each tier. The cells in the North cellhouse measure 64 inches by 125 or about 55.5 square feet. In the North cellhouse each tier of cells has two showers, and showers are available to inmates once a week. The laundry services in the North cellhouse are available on a once-a-week basis. The witnesses uniformly observed that the North cellhouse was not as neat or clean as the South and West cellhouses.[4]

In the general population, the two-man cells are uniformly very small and cramped[5] and it is difficult if not impossible to move about the cell unless one inmate is on a bunk. Dr. Christianson, the court appointed expert, related that the cells were so cramped that he had to back out of one of them to permit an inmate to leave. That observation is substantiated by the court's own inspection of the cells at Pontiac.

The sink in the cell has a cold water and a hot water tap. Inmates report that hot water is available only on an intermittent basis and the court appointed expert, Dr. Christianson, reported that there was no hot water in the taps that he tested at the time of his visit.

Light is provided in the cells by a single fluorescent bulb in the ceiling and air vents are present in the upper back wall in the West cellhouse and in the lower rear wall in each of the other cellhouses. The inmates cover the vents in most instances to cut off the spread of dust and roaches. R. at 364–65. In those cells where the vents were open, Dr. Christianson said he could feel no airflow.

The West and South cellhouses have fairly large yard areas connected to them. The yard areas are fenced in with cyclone wire fencing and have half court basketball and other recreational equipment available. The North cellhouse has two small yards which will allow a maximum of ten inmates in a yard area at any one time.

## IV

Of the 1622 prisoners inside the walls at Pontiac only about one-half have regular work or school assignments. The remaining half of the population is divided into unassigned or idle general population, protective custody or disciplinary segregation. The West cellhouse population comprises the assigned or work force. Most of the unassigned inmates are housed in the South cellhouse. The North cellhouse contains the prisoners in disciplinary segregation and those in protective custody.

The daily routine of prisoners and the quality of life in Pontiac I found was best gathered from the testimony of the inmates themselves which I credit.

---

4. This difference probably is attributable to the fact that the inmates in the North cellhouse are in disciplinary segregation or protective custody and the cleanliness of the cellhouse would reflect the attitude of those in segregation. In addition the segregated prisoners are fed in their cells and there is food spillage in the process.

5. R. at 39. Testimony of court appointed expert Dr. Steven Christianson.

## A.

John Joseph Generella is a fifty-three year old inmate at Pontiac who lives in the West cellhouse. Generella was serving a four year term for robbery and attempted burglary and theft.[6] He has a job assignment in the institution caring for the inner lawn and is also a boxing coach at the institution's gymnasium. Generella has had a succession of cellmates who caused him trouble. He describes one "celly" who was a member of the Ku Klux Klan. R. at 325–26, 328. Generella says he was fearful of attack by other inmates because it was thought that he too was a member of the Klan. One cellmate was a Black youth who belonged to a Black gang and used his connections in an attempt to extort personal property from Generella. R. at 326, 330. Generella says that he had to threaten to strike that cellmate with the stool to put an end to the extortion. Generella reports that he had a similar experience with a Hispanic youth who belonged to a Hispanic gang.

Generella says that double celling is a constant source of difficulties. You live in constant fear that your cellmate may "go off," that is attack you.[7] You have no individual property. Your personal belongings become common property with the cellmate. It is smart to share or else you have to fight and the stronger man in the cell will always win and dominate matters. R. at 327, 332–34.

Mr. Generella has had problems with cellmates who would spatter the cell floor when they urinated in the toilet. R. at 331. He had one sixteen year old cellmate who spent a good deal of his time sitting in the corner masturbating before the picture of a nude woman. R. at 335. There is the continual fear, he says, of homosexual attack. A grievance is an ineffective tool to remedy a difficulty with a cellmate, Generella says, because of the time involved in processing a grievance.

Generella says that he can't go out to the yard on Sundays because of gang fear, R. at 337, but because of his lawn job and his assignment as a boxing coach at the gymnasium, Generella is out of his cell about six hours a day, five days a week. While working at his lawn assignment, however, Generella states, his tasks generally take fifteen minutes to complete and during the remaining four hours, he just pushes dirt around. R. at 312–13.

## B.

Yusuaf Asad Madyun, also known as Joseph Hurst, is a murderer. In 1968 he was sentenced to death which was reduced to 100 to 300 years. He is also serving a term of nineteen to twenty years for attempted murder and a third term of nine to ten years for aggravated battery.

Hurst was graduated from high school in 1961. He attended Southern Illinois University and Iowa State for a time and worked for two years as a CTA bus driver in the City of Chicago. He also was employed as a driver for the Nabisco Baking Company.

He first went to Pontiac on May 8, 1974, and he has been a resident there ever since. He has lived in a single cell since August 1980 when this court issued a temporary injunction directing that he be placed in a single cell. He currently lives in the South cellhouse where most residents are unassigned except to the mess hall and to cellhouse cleaning of the common areas. Madyun is unassigned mainly because he has refused assignments which he didn't think were challenging mentally. R. at 130–31.

Madyun, who is a practicing Muslim, describes a typical day. R. at 133–42. He

---

6. Generella was released from Pontiac subsequent to the date of the hearing.

7. "It can go off on you and things like that .... Might threaten me, might hit me with something. He may have a fountain pen in his hand and try to stick me. You never know. How much can you flow with the punches, and the first time you can't, I feel your life is in jeopardy. I have seen that happen many times. Every morning, you can hear the arguments, the cell partners, punk this or this, or he tried to feel ass, or whatever. It is a constant thing...." R. at 331.

arises at about 4:30 a. m. to say prayers and after prayers he reads until about 7:00 a. m. The first bell for breakfast is between 8:00 and 8:15 a. m. There is no fixed time but a general time. The service of meals depends on the movement of other inmates throughout the institution, on count, and on weather.

The mess hall is located in the South cellhouse and the South cellhouse inmates eat after the West cellhouse inmates have been served. Madyun says he is out of the cell for about forty minutes for breakfast and then back in the cell until "yard"[8] is called. Madyun says he may also have a "call line"[9] about four times a week which permits him to leave the cell and move about the institution to a designated place but that some inmates have no call lines. R. at 136. Yard time during the morning lasts for about an hour to one hour and a quarter. In the winter time yard occurs only in the morning but in the summer it occurs in the afternoons as well. There is only one yard call a day on weekends and, except for that and mealtimes, the inmates are confined to their cells. In the winter time a period for the use of the gymnasium occurs twice a week.

Lunch generally begins about noon but may be as late as 2:30 p. m. and depends on what is served in the mess hall and the absence of "wrinkles."[10] Lunch lasts between thirty and forty minutes. At the end of that period the inmates return to their cells and wait for afternoon yard which lasts for an hour and a half to two hours.

Supper is generally at 5:00 p. m. but may be as late as 8:00 p. m. depending again on movements and "wrinkles."

An inmate in the South cellhouse is permitted to have a shower three times a week which allows him to be out of his cell between ten and twelve minutes on each occasion. There is a movie once a week which may be attended by inmates, and there are Muslim religious services on Friday from noon to 1:00 p. m. and on Thursday there is a Muslim instruction class from 1:30 to 2:30 p. m.

Generally an inmate in the South cellhouse will be out of his cell during a typical day a total of between four and four and one-half hours. R. at 142.

Out of cell activities Madyun states are not well attended because of the hazards that are involved. R. at 142–43. For example, movies are focal points for gang activities—for a "hit," for drug dealing or for homosexual activity. R. at 143. The same problems exist at chapel and at yard time. R. at 144. The guards cannot provide adequate security when a group meeting is in progress, and violence occurs when group movements take place. Inmates fear group movements and tend to stay in their cells except when necessity makes them come out. Madyun had been double celled from 1976 until the issuance of the temporary injunction in August 1980 with the exception of brief periods when his cellmates were changed.

Madyun describes the difficulties that arise from being celled with a person of different moral standards, a person of different religious beliefs, or a person with gang affiliations. R. at 147. Madyun, who is a large man, standing six foot two inches and weighing 195 pounds, describes the difficulty two large men have in the limited physical space of the cell. R. at 148–49. He points out the absence of privacy and the inability to be alone at any time, which considering the length of his sentence, may be the remainder of his life. R. at 149–50. There is always the danger from sex attack, Madyun says, especially if the other inmate is bigger and stronger. R. at 151.

Madyun describes an incident he observed at the institution. R. at 151–57. In March 1981, at about 7:00 p. m. the two inmates housed in the cell next to Madyun began fighting. Madyun put his mirror out of his

8. "Yard" is the recreation period in which inmates are allowed to leave their cells and go to the cellhouse yard.

9. A "call line" is the designation indicating that an inmate has a pass.

10. Disturbances among the inmates.

cell so he could watch the fight. The fight lasted for an hour to an hour and one-half with no officer on the gallery to interfere. No other inmate called the guard because inmates mind their own business and don't mix in. The men would fight until they were exhausted and then rest. During one of the periods when the men were exhausted and resting one of them saw Madyun watching them and said, "I knocked over an ashtray and he wants to whip me." They were fighting over keeping the cell clean. Both inmates were sent to the segregation unit for fighting.

Madyun has had eight to twelve cellmates during his period of incarceration at Pontiac and complains especially about a cellmate's interference with Madyun's religious practices. R. at 160–61. As a Muslim he is required to pray outloud five times a day and his cellmates have played the radio loudly, and made noise or critical comments during the periods of prayer.

Madyun further asserts that the overcrowded conditions at Pontiac lessen the quality of services provided. R. at 163–164. When he first came to the institution in 1974 there were between 700 and 800 inmates. Madyun claims that since 1974 the quality of the food services, the availability of school programs, and the opportunity to use the library and the recreation facilities have declined because of the presence of the now over 1800 inmates.

Madyun however, it must be observed, continues to be unassigned by choice. In the past, he has worked in the law library and in vocational education. R. at 168. He has many personal belongings in his cell including a typewriter, a television set, a radio, and books and papers.

### C.

Francisco Negron is serving seven years for armed robbery. He is a resident in the South cellhouse at Pontiac and is double celled. He begins his day by arising at 7:30 a. m. to wash up before his "celly" arises. Negron spends about twenty minutes at breakfast between 8:30 and 9:00 a. m. and at 9:00 a. m. he goes to his job as supply clerk for the South cellhouse where he passes out cleaning materials and toilet paper to gallery workers. He says he is lucky to have the job and has had it for about one month. Most of the inmates in the South cellhouse don't have jobs or assignments of any sort. The South cellhouse, as Negron describes it, is a "waiting house" and only about forty people have assignments.

At 2:30 p. m. Negron goes back to his cell where he remains until dinner time at 5:00 p. m. After dinner he is locked up for the night.

Negron goes to yard in the afternoon but not in the morning. He has showers three times a week which last about twenty minutes for the whole gallery. Negron is enrolled in a correspondence course in the television college program in the institution. He uses a manual, watches the television broadcast and takes tests that are sent out by the educational program.

Negron says the institution is overcrowded and there are not enough jobs to go around. R. at 184. He tried unsuccessfully when he came to Pontiac to get a job and was lucky, as he puts it, in finally getting the job as supply clerk.

Negron described other fights, disturbances, and problems caused by the overcrowded conditions. He described inmates fighting over use of the television. R. at 193. A cellmate has tampered with his mail and with his belongings. R. at 194. Negron described how in June or July of 1980 he was placed in segregation because a "shank" [11] was found in his cell and both he and his cellmate ended up "getting walked." R. at 194. Under the code of silence that prevails among prisoners neither Negron nor his cellmate would say who possessed the contraband and so both were disciplined. R. at 195–96. Negron described how he was celled once with a gang member and was pressured to buy things at the commissary for his cellmate by other members of the gang who threatened Neg-

---

11. A piece of metal sharpened and shaped to be a knife or weapon.

ron with physical violence if he didn't share with his cellmate. R. at 197.

### D.

Hassan Abid Muhamad, also known as Irving Lawrence Madden, resides in the West cellhouse in Pontiac and is serving a sentence of fifteen to forty-five years for armed robbery, rape and aggravated kidnapping. He has been double celled at Pontiac for about four years.

Muhamad is not an ordinary inmate. While single celled in prison he obtained an associate in arts degree and currently lacks about fifteen credit hours for his bachelor's degree. He takes a full-time sixteen hour course in his school assignment. He resides in the T.V. College gallery of his cellhouse. Muhamad attends class twice a week and those classes last two and one-half hours. He testifies he is out of his cell about three and one-half hours on days when he has no classes. R. at 391.

Muhamad says that on weekends one-half a cellhouse at a time can go to yard and that consequently cell time is greater on weekends than it is on weekdays.

Muhamad says his ability to study is severely hampered by his being in a double cell. R. at 393. There is one desk in his cell, but if his cellmate is using the desk, Muhamad has to stand and use the top bunk since the bottom bunk is too low to study on. R. at 395. His religious activities and ability to pray as a Muslim are also limited by cellmates who are not Muslims. Some of Muhamad's cellmates have turned on the television or record player, smoked and otherwise harassed Muhamad while he was reciting his prayers. R. at 396–98.

Muhamad says that in his cell there is an area about one and one-half feet wide by four feet long which is a walking area. R. at 394. If one cell occupant wants to walk through the cell, the other inmate must get on the bunk to allow room for passage without touching. R. at 394.

Muhamad describes all the facilities at Pontiac as being overtaxed. The health service and the food service are both insufficient in quantity and deficient in quality. R. at 400–02. Access to the general library and to the law library have been restricted due to the overcrowded conditions, Muhamad asserts.[12] R. at 403–04.

### E.

Johnny Smith is a convicted murderer and is currently assigned to the protective custody unit in the North cellhouse. He has experienced double celling at Cook County Jail, in Joliet, and Stateville, and for a very brief period at Pontiac. He was placed in segregation at Pontiac because of his refusal to accept a double cell. When double celled he had cellmates who were homosexual and others who were gang members and extortionists. R. at 358, 360–62. Smith spends twenty to twenty-two hours a day in his cell in protective custody and does so voluntarily because of his rejection of double celling. During his four years at Pontiac Smith has spent twenty-eight months in segregation and eighteen months in the protective custody unit as a result of his refusal to be double celled. R. at 335. Because of the gang members at Pontiac, Smith says that he does not feel safe in a double cell. R. at 376.

Smith claims to be a hyperactive and nervous person who requires a single cell because of his physical and emotional state. R. at 357. He is currently taking Librium as medication for his condition, twenty mg. in the a. m. and twenty mg. in the p. m. R. at 371.

### V

Warden Fairman and Assistant Warden Wright also describe the routine of prisoners and what a day is like at Pontiac and their testimony conflicts in certain aspects with that given by the inmates. Warden Fairman tends to minimize the hours in a day which an inmate spends in his cell. It is noteworthy though that Assistant Warden Wright who prepared defendants' exhibit sixty-nine shows by his testimony and by

---

12. The law library accommodates about four prisoners at a time. Prelim.Inj.R. at 72.

that exhibit that West cellhouse inmates are in their cells sixteen hours a day. The West cellhouse is the unit which houses assigned inmates who are out of their cells for longer periods of time than inmates in any of the other units. Defendants' exhibit sixty-nine therefore tends to corroborate the observations of the other witnesses, both the inmates and the professional penologists called by the plaintiffs, that the South cellhouse inmates spend twenty hours a day in their cells.

## VI

The parties presented the testimony of five persons who were experienced in the management of correctional institutions and departments.

### A.

The witnesses called by the defendants, C. Paul Phelps, Jr., Secretary of Corrections of the State of Louisiana, and John N. Brown, Warden of Adult Correctional Institutions in Rhode Island were generally commendatory about the way in which Pontiac was administered. They found the prison to be physically neat and clean and did not notice any undue tension among the prisoners.

Mr. Phelps admitted that he was opposed to the concept of single celling in corrections and that he objected to the American Corrections Associations' standards on single celling on philosophic grounds. Mr. Phelps just does not believe institutions should be single celled. Louisiana at this time, Mr. Phelps says, has no accredited institution. R. at 1109. While Mr. Phelps did not feel that Pontiac transgressed standards of decency and humanity, R. at 1091, he did say on cross-examination that any warden would like to have the option of single celling and that a good classification system was needed if double celling was to be employed. R. at 1093, 1132. Phelps further testified that when inmates are double celled, at a minimum there should be enough space in the cell for both inmates to move about the cell without the necessity of one inmate being on a bunk. R. at 1133.

From the credible testimony of the other witnesses, and from my own observation of the cells at Pontiac, I find that Pontiac does not even measure up to that minimum standard.

I formed the opinion about Mr. Phelps and Mr. Brown that they were sympathetic with their fellow prison administrators and the conditions under which they had to work and because of their occupations tended to be biased. This bias I find discredits their opinion that the conditions at Pontiac do not transgress today's standards of decency and humanity.

### B.

The penologists put forward by the plaintiffs on the other hand displayed a more sympathetic attitude towards the prisoners and towards the corrections officers. Joseph C. Cannon, associate professor of administration of justice at the University of Missouri, has been the warden at Stateville in the Illinois Correctional System. He was also administrator of the Central Region of Adult Field Services for the Illinois Department of Corrections. Mr. Cannon examined Pontiac and found the ventilation close and stuffy. R. at 252. He did note that the West and South cellblocks were relatively clean but there was, he said, a "borderline stench" due to the number of people in too small a space. R. at 252. He found the noise level very high but was impressed by the amount of personal property that the prisoners were allowed to keep. R. at 253.

Mr. Cannon testified that it was "quite obvious" that the cells at Pontiac were too small for two people. R. at 256. In fact he expressed amazement that some of the cells could house two inmates because of the lack of unoccupied space in a cell. R. at 253.

Mr. Cannon has definite opinions about the effects of double celling on managing an institution. That opinion arises in part from his experience at Stateville in 1974. When he went to Stateville it was "deadlocked," but he succeeded in bringing it out of deadlock within a few months because of a slump in commitments in 1974 which en-

abled him to move Stateville toward single celling. Once single occupancy cells were instituted at Stateville, problems in managing and controlling the inmates were reduced. R. at 244.

The overcrowded conditions at Pontiac which manifest themselves in the double celling practices have a deleterious effect on both the inmate and the correctional officer according to Mr. Cannon. The prisoner, Cannon says, because he has no privacy, is agitated, feels less like a human being and becomes potentially dangerous towards both the other inmates and the correctional officers. R. at 255, 257. In moving about the tiny cell the prisoners bump into each other constantly. This intrusion into privacy happens in connection with all living activities including the use of the toilet and is a constant source of irritation. The lack of privacy and the constant closeness invites homosexuality, Cannon believes. R. at 259. In sum, double celling at Pontiac denigrates the inmates and destroys their potential for correction and in consequence damages society even further. R. at 260–61.

Double celling dulls the sensitivity of the correctional officer to the prisoner's needs because of the conditions under which the prisoner is confined. The correctional officer, Cannon says, builds a calloused attitude towards the inmate and looks upon the inmate as something less than a human being. That attitude becomes a defense mechanism for the correctional officer who is unable to cope with the overcrowded conditions.[13] R. at 258–59.

People in prison, Mr. Cannon concludes, and the court joins in that conclusion, do not remain static. They either improve or they deteriorate. At Pontiac, Mr. Cannon observed a tension and anxiety in the prisoners and an absence of any casual or relaxed attitude. R. 289. He relates that to the overcrowded conditions and to the practice of double celling.

While additional time out of the cell at Pontiac might tend to ameliorate some of the effects of the overcrowded conditions, that additional time will not solve the difficulties. R. at 259. It is obvious and plain common sense that permitting the Pontiac prisoners to move freely about the institution during daytime hours would create a security problem with which the prison administration could not cope. R. at 302–03. The inescapable conclusion is that the overcrowded conditions and the double celling handicaps anything the administration tries to do about programs or security, and the result is the destruction of the inmates potential for correction. R. at 260.

### C.

David Fogel, professor of criminal justice at the University of Illinois, Chicago Circle Campus, has spent a good portion of his life working in corrections and has been superintendent of the Marin County Juvenile Home which is a maximum security institution in California. He has been Commissioner of the Minnesota Department of Corrections and has headed up the Illinois Law Enforcement Commission State Planning Agency. He is a member of the American Corrections Association and has been active in training staff members to become auditors for accreditation of prisons.

Dr. Fogel points out that the cells at Pontiac fail to comply with current standards for cell size. The federal standard for prisons and jails provides that each inmate shall have sixty square feet if incarcerated for less than ten hours per day and eighty square feet if incarcerated for more than ten hours per day. The National Sheriff's Association Handbook on Jails provides for seventy to eighty square feet per inmate. R. at 682. The Manual of Standards for the American Corrections Association is the same as the federal standard. R. at 681–82. The United Nations standards for prisoners provides for one inmate to a cell as does the National Advisory Committee on Criminal Justice. R. at 685, 687. The American Public Health Association recommends sixty square feet per inmate and

---

**13.** Mr. Cannon is commendatory of the Warden at Pontiac and says that Pontiac is "better supervised than any prison I have ever visited." R. at 297.

that they be housed in a single cell.[14] R. at 686.

Dr. Fogel spent two days at Pontiac. The first day he toured the prison spending seven hours inspecting the cellhouses, and the second day he interviewed selected inmates. He did not interview anyone from protective custody or from segregation but only from the West cellhouse and the South cellhouse. Fogel described his observations of how the inmates live, share, and handle their intimate problems, and of the amount of light, space and ventilation the inmates have. He found that there were odors in the cells that he labelled "unavoidable smells" arising from the cell toilet shared by two people and the problems of personal hygiene that accompany such close proximity. R. at 698. Fogel observed that the infrequency with which showers were available was a "major problem." R. at 698. He also observed that the noise level in the cells was very high and the security of an inmate's property was very low. R. at 698–700.

Fogel is of the opinion that there are emotional problems that accompany double celling because of the absence of privacy. It is even difficult to write someone a letter in any sort of private circumstance, he says. R. at 701. Fogel also found that the likelihood of increased homosexual activity accompanied double celling. R. at 702. He further was of the opinion that studying was difficult and was hampered because of the lack of available study space and noise in a double cell. R. at 702. He discussed the difficulties between cellmates caused by contraband being found in a cell and the necessary, automatic assumption by corrections officials that it was shared contraband. R. at 703. He spoke of the conflicts caused by smoking where one cellmate would smoke and the other would not and how the religious practices of inmates placed in a double cell are severely curtailed. R. at 704–05. The age differences and life-styles of the inmates and their dif-

ference in sexual drives are also sources of friction and tension in double celling situations. R. at 705–06.

Dr. Fogel found that the inmates in the West cellblock spent between eighteen and twenty hours in their cell and longer periods of time on weekends. R. at 707. The inmates in the South cellblock had about the same cell time as the West cellblock. R. at 707. In the North cellblock the inmates spend twenty-three hours a day in their cell. R. at 707. Dr. Fogel's conclusions on cell time were based not only upon his conversations with inmates but also upon information gathered from correctional officers at Pontiac. R. at 708.

Dr. Fogel's opinion is that the conditions in Pontiac transgress the minimal requirements of decency and humanity and shock the conscience. R. at 737–39. He said overcrowding places a strain on all institutional services, resulting in a diminished amount of time for showering, eating and recreation as well as scarce and meaningless work assignments. R. at 721. Double celling has also created an "enormous amount" of tension, stress and anger which tension, stress and anger are exacerbated by the length of time the inmates are confined to their cells. R. at 727. The guards, Dr. Fogel says, are therefore in greater jeopardy and the inmates are a greater threat to the community when they are released. R. at 722. Double celling he believes eliminates the good effects of the other programs at the institution and increases the probability that the inmates' attitudes and skills will degenerate during the period of incarceration. R. at 724.

Dr. Fogel accuses the administration of Pontiac of presenting misleading and inaccurate records of the time spent by inmates in their cells. R. at 725–26. He cites as examples that inmates are counted as being in school when in reality they are in their cells watching a television screen; that in-

---

14. Dr. Fogel reported that the *net* space available to each double celled inmate at Pontiac is nine square feet. R. at 735. That is borne out by the court's observation. Dr. Fogel also not-

ed in particular one cell where the aisle between the bed and the bureau was only six inches. R. at 736.

mates are counted as being in the yard when in reality they are in their cells; and that inmates are counted as being at religious services when in reality they are in their cells.

Dr. Fogel says that double celling makes the incidence of unlawful activities higher. R. at 733. Overcrowding promotes stealing, tension, fights and animosities among the inmates and these in turn lead to loss of good time and longer stays in prison and substantially lessen the likelihood of any corrective effect in incarceration.

Being in prison is the punishment that is imposed upon a convicted felon, Dr. Fogel says. In addition, to confine the felon twenty hours a day in an overcrowded cramped space which is ill lit and ill ventilated, often without opportunity to work or to participate in corrective programs, makes that punishment cruel and unusual and shocks the conscience. R. at 739. In Dr. Fogel's opinion, the overcrowded conditions at Pontiac have created an environment where self-improvement is unlikely and degeneration is probable. R. at 735–36.

It is apparent that Dr. Fogel is a rather controversial person in the area of corrections and has very definite ideas that probably conflict with a strict authoritarian or disciplinarian approach to corrections. When he was in the Illinois Planning Agency he visited Pontiac and he agrees with the Illinois Master Plans for Prisons that Pontiac should be closed. With due regard for his sympathies and the fact that he is controversial, I find Dr. Fogel's testimony to be credible and persuasive.

## VII

Pontiac has no classification program for screening prisoners before assignment to a double cell. Linda Adams, who is the person in charge of the research and evaluation unit in the Illinois Department of Corrections, says that no classification program for adult males is presently in use and consequently there is no way to make a proper placement. R. at 1159–A.

The Deputy Director for Policy Development of the Illinois Department of Correc-

tions, Laurel Rands, says that the ABT Associates Study on United States Prisons, which takes up five separate volumes, shows Illinois with over 60% of its inmates sharing a cell with less than sixty square feet. R. at 1173. The study defines a crowded confinement unit as a cell with two or more inmates and less than sixty square feet of floor space per inmate. Eighty percent (80%) of all state cells on the other hand are single cells and 90% of all federal cells are single cells. R. at 1221, P.Ex. 65, Vol. I, at 59.

Warden Wright testified "I don't see the problems of double celling." R. at 1060. That statement demonstrates Fogel's and Cannon's observation that double celling engenders a callousness on the part of the administration and that administrators adopt a protective, rationalizing, self-justifying reaction in defense of the overcrowded conditions.

## VIII

### A.

The court's appointed expert witness, Dr. Steven Christianson, was charged: (1) to survey existing literature in the field describing the effects of long term close confinement of human males; (2) to inspect the Pontiac Correctional Center; (3) to prepare himself to report to the parties and to the court on his findings gained from his survey and his inspection. In addition to his findings concerning the physical plant at Pontiac, which I have described earlier in these findings, Dr. Christianson concluded and was of the opinion that by current social standards Pontiac is overcrowded.

Dr. Christianson found that frustration, tension, and violent activities had increased in the institution since double celling was instituted. He based that opinion upon his interviews with inmates and also upon the report of the Illinois Correctional System which described the conditions at Pontiac Correctional Center in 1977.

Dr. Christianson was of the opinion that transmission of disease is increased with

crowding not only because of the close proximity of people but also because of the lack of adequate hygiene and the overtaxed sanitary facilities, ventilating systems, and laundry facilities. He also reported a general consensus of professional thought that overcrowding in a prison leads to increased death and illness rates, increased psychiatric commitment rates, and increased institutional violence.

Dr. Christianson was of the further opinion that the overcrowded situation at Pontiac has increased stress and tension in the institution, he also found a distinct, greater, negative effect from double celling compared with single celling manifested by increased stress and tension.

The problems associated with overcrowding, such as increased institutional violence and disciplinary infraction rates, are compounded by limited access to recreation or job activities at Pontiac and the lack of a proper classification system. Available services have deteriorated at Pontiac as the prison has become overwhelmed by population increases.

### B.

Terry R. Brelje, a medical psychologist and administrator of the Chester Mental Health Center and coordinator of the Illinois Forensic Psychiatry programs, is of the opinion that the literature on crowding does not have scientific validity. That opinion is shared by James Louis Cavanaugh, a physician with a board certified specialty in psychiatry. Dr. Cavanaugh is director of the Issac Ray Center in Chicago and is also director of the Department of Psychiatry and Law at the Rush Presbyterian St. Luke's Medical Center in Chicago. Dr. Cavanaugh states that there is no high degree of scientific reliability in the studies on crowding because overcrowding is a variate which depends on a myriad of other stimuli responses and interactions including the number of roommates, the amount of privacy, recreational facilities, daily routine and the way in which a prison is administered. R. at 479.

Dr. Cavanaugh concluded, therefore, that the scientific methodology does not exist to determine the effects of overcrowding. R. at 486. But Dr. Cavanaugh did say that while it could not be said with clinical certainty that stress, tension and other deleterious effects flowed from the overcrowded conditions at Pontiac, he agreed that such effects might or could result from overcrowding.

Dr. Cavanaugh testified that the fact that some inmates were unassigned to work or school was considered by him but not given great emphasis. He considered the problem of unassigned inmates as not central to his study. I find that approach startling. His erroneous understanding, which apparently was supplied by the defendants, is that prisoners could be out of their cells up to thirteen hours a day. R. at 1593. On cross-examination he stated that his understanding was not good of the length of time that prisoners spent in their cells and that if he had been told he had forgotten. When pressed on the point Dr. Cavanaugh did say that the length of time in the cells was certainly an issue one would want to consider in deciding whether the totality of circumstances constitute cruel and unusual punishment. R. at 1591.

Dr. Brelje, when questioned by the court, admitted that under current standards of humanity and decency, placing two men in a Pontiac cell would violate those standards, and that the amount of space in a cell per prisoner should conform to the standards promulgated by the American Correctional Association. R. at 636.

Dr. Brelje interviewed Johnny Smith and found him to be a nervous and hyperactive person who was suspicious, passive-aggressive, and possessed personality defects but who was not mentally ill. R. at 579. Dr. Cavanaugh expressed a similar opinion saying that Smith did not have any freestanding psychiatric disease and that Smith does not need a single cell for medical or psychiatric reasons. R. at 466. However, Dr. Cavanaugh did volunteer that he would give Smith a single cell for humanitarian reasons. R. at 1612.

Michael Lane, Director of the Illinois Department of Corrections, testified that all cells being built in Illinois at this time meet or exceed the American Correctional Association standard. R. at 1436. The average size of a new cell is seventy square feet and in all cases the cells are designed for single occupancy. *See also* Ill.Rev.Stat. ch. 38, § 1003–7–3(b) (1977), which provides that: "All new, remodeled and newly designated institutions or facilities shall provide at least fifty square feet of cell, room or dormitory floor space for each person."

Finally it is noteworthy that Dr. Gerald Foley, the medical director at Pontiac, volunteered to the court during the hearing on preliminary injunction that the celling conditions at Pontiac were cruel and unusual. "I think the space of the prison cells is too small for either single or double cell. I think to force a human being to live in a closet is cruel and unusual punishment . . . . Now my personal preference is adequate space as to the cell size." Prelim.Inj. R. at 502.

Dr. Foley added that tension at Pontiac could be eased if the inmates had more space and concluded, "If I were going to do something about the situation personally, I'd make the single and double cell an optional thing, and I damn well would make the cells bigger." Prelim.Inj. R. at 503–04.

### IX

The constitutionality of the circumstances of confinement has been before the United States Supreme Court and the Seventh Circuit Court of Appeals in a number of cases. In *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court held:

> The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, "proscribe[s] more than physically barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102 [97 S.Ct. 285, 290, 50 L.Ed.2d 251]. It prohibits penalties that are grossly disproportionate to the offense, *Weems v. United States*, 217 U.S. 349, 367 [30 S.Ct. 544, 549, 54 L.Ed. 793], as well as those that transgress today's " 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' " *Estelle v. Gamble, supra*, [429 U.S.] at 102 [97 S.Ct. at 290], quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (CA 8 1968). Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards.

*Id.* at 685, 98 S.Ct. at 2570–71.

■ The length of confinement is a vital consideration in deciding whether the circumstances of the confinement meet constitutional standards. So conditions that might be tolerable for a short period of time may become intolerable and cruel if extended over long periods. *Id.* at 687, 98 S.Ct. at 2571. Inmate confinement at Pontiac usually extends over a period of years, and, in some cases, for decades.

*Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in which the Supreme Court held that "double bunking" of pre-trial detainees did not deny them liberty without due process of law, is distinguishable from this case. This is a case involving punishment of convicted prisoners. *Bell* is not. In *Bell*, each of the detention rooms or cells had "a total floor space of seventy-five square feet." *Id.* at 541, 99 S.Ct. at 1875. Here the cells have fifty-five square feet of total floor space. In *Bell*, "inmates generally are locked into their rooms from 11:00 p. m. to 6:30 a. m. and for brief periods during the afternoon and evening head counts. During the rest of the day, they may move about freely between their rooms and the common areas." *Id.* Here the confinement of the inmates in the double cells is for eighteen to twenty hours a day. Again, in *Bell*, the confinement of the detainees was generally for a maximum period of sixty days. *Id.* at 543, 99 S.Ct. at 1876. Here, the confinement is measured in years.

*Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), is the Court's most recent pronouncement on prison conditions as cruel and unusual punishment under the eighth amendment. The

conditions of the prison described in *Rhodes* seem almost the antithesis of the conditions at Pontiac. In *Rhodes* the prison was built in the early 1970's. It was described by the district court as a "top-flight, first-class facility." At ——, 101 S.Ct. at 2395 (quoting *Chapman v. Rhodes*, 434 F.Supp. 1007, 1009 (1977)). A large number of the cells had a window that the inmates could open and close. Day rooms were located adjacent to the cellblocks and were open to the inmates between 6:30 a. m. and 9:30 p. m. Inmates were permitted to pass between cells and the day rooms during a ten minute period in each hour. Seventy-five percent of the double celled inmates had a choice of spending much of their waking hours outside their cells. The air ventilation system was described as adequate and the cells were substantially free of offensive odors. The temperature in the cellblocks was well controlled and the noise was not excessive. The double celling practices in *Rhodes* did not render inadequate the resources of the library or school rooms. At Pontiac, on the other hand, the conditions are exactly contrary to the conditions found to exist in *Rhodes*.

*Rhodes* points out that the Constitution does not mandate comfortable prisons and that prisons which house persons convicted of serious crimes cannot be free of discomfort. But *Rhodes* also makes the point that courts certainly have a responsibility to scrutinize claims of cruel and unusual punishment and that conditions in a number of prisons, especially older ones, have justly been described as deplorable and sordid. *Id.* —— U.S. at ——, 101 S.Ct. at 2401 (citing *Bell v. Wolfish*, 441 U.S. at 562, 99 S.Ct. at 1886).

If, as *Rhodes* teaches us, the goals of the penal function in the criminal justice system are to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law abiding citizens, Pontiac fails that test. *Id.* —— U.S. at ——, 101 S.Ct. at 2402. But it also must be borne in mind that a practice that may be undesirable from the standpoint of penology may not necessarily be forbidden by the Constitu-

tion. *Hutto v. Finney*, 437 U.S. 678, 688 n.12, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522 (1978).

The Seventh Circuit in *Stringer v. Rowe*, 616 F.2d 993 (7th Cir. 1980), held that "in order to establish a violation of the eighth amendment, a plaintiff must show that prison officials knowingly maintained conditions so harsh as to shock the general conscience." *Id.* at 998. In *Chavis v. Rowe*, 643 F.2d 1281 (7th Cir. 1981), the court in passing on the plaintiff's claim that his confinement with four others in a five foot by seven foot space violated the eighth amendment observed:

> Courts have found conditions of overcrowding to be *per se* unconstitutional because the purpose of the prohibition against cruel and unusual punishment is to protect and safeguard a prison inmate from an environment where degeneration is probable and self-improvement unlikely due to conditions which inflict needless mental or physical suffering.

At 1291.

In *Lock v. Jenkins*, 641 F.2d 488 (7th Cir. 1981), the court observes that: "It seems to us that a minimum requirement as to cell area should be imposed and this minimum should be determined flexibly in relation to the amount of time individuals are to be kept in the cell." At 494.

■ The standards set by a legislature are an important indicator of the "civilized standard" which constitutionally cannot be transgressed when a punishment is being imposed. *See Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (when making an eighth amendment judgment, courts should look at objective factors such as "legislative attitudes"); *Furman v. Georgia*, 408 U.S. 238, 437, 92 S.Ct. 2726, 2728, 33 L.Ed.2d 346 (1972) (Powell, dissenting) ("[T]he first indicator of the public's attitude must always be found in the legislative judgments of the people's chosen representatives."). If the indication of the public's attitude is to be found in the enactments of State legislatures, then Illinois recognizes that the cell-

ing conditions at Pontiac are contrary to current standards of decency. Ill.Rev.Stat. ch. 38, § 1003–7–3(b) (1977) provides that new or remodeled prisons shall have cells with fifty square feet per inmate. In addition, each of the witnesses who testified agreed that the conditions at Pontiac were overcrowded and that, cost considerations aside, they would prefer to have the prisoners housed one to a cell not only to serve the penal function but for security reasons as well.[15]

## X

■ The inescapable conclusion is that the Pontiac Correctional Center is overcrowded, antiquated, and has inadequate facilities to provide significant and constructive correctional programs to the inmates. The confinement for years on end of two adult males for periods of eighteen to twenty hours a day in a cramped, ill ventilated, noisy, space designed a century ago for one person is a punishment that is contrary to every recognized modern standard of penology and is in conflict with minimum standards established by the Illinois legislature.

The Pontiac medical director volunteered that he thought the double celling conditions at Pontiac were cruel and unusual.

The professional witnesses, whose testimony the court credits, found that the conditions at Pontiac transgressed today's standards of dignity, humanity, and decency.

The burgeoning prison population, the inadequacy of existing facilities, and the expense of providing additional facilities are the only reasons found in the evidence for the maintenance of the overcrowding at Pontiac. Those reasons are constitutionally inadequate. *See Preston v. Thompson,* 589 F.2d 300, 303 (7th Cir. 1978).

I conclude, therefore, that the double celling conditions at Pontiac constitute cruel and unusual punishment and violate the eighth amendment.

■ I also conclude that there is inadequate evidence in the record to support a

finding that the plaintiff Smith has deliberately been refused necessary medical treatment. Smith has failed to carry his burden of proof on that issue. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

It is obvious that if the defendants were ordered by the court to abandon the practice of double celling at Pontiac immediately and to assign prisoners who requested it to a single occupancy cell that the facilities at Pontiac could not accommodate the present prison population. It is equally obvious that the State of Illinois presently does not have sufficient facilities to house the overflow population from Pontiac in other institutions. The burden upon society and the mischief that would be created by such an order outweighs the deprivation and loss that is placed upon the plaintiffs by the overcrowded conditions at Pontiac. An appropriate remedy under these circumstances would be to direct the defendants to submit a plan to the court to remedy the overcrowded circumstances at Pontiac at the earliest date possible by moving to single occupancy celling.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the conditions of confinement at Pontiac Correctional Center whereby inmates are involuntarily confined in a double occupancy cell constitute cruel and unusual punishment and violate the provisions of the Eighth Amendment to the Constitution of the United States.

IT IS FURTHER ORDERED that the defendants, within sixty days, submit a plan to the court to remedy the overcrowded conditions at the Pontiac Correctional Center at the earliest date possible by moving to single occupancy celling.

15. *See e.g.,* Prelim.Inj. R. at 372 (testimony of Warden Fairman).