**Johnny SMITH, Plaintiff-Appellee,**

**v.**

**J. W. FAIRMAN, et al., Defendants-Appellants.**

**Nos. 81–2859, 82–1052.**

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1982.

Decided Oct. 5, 1982.

Rehearing and Rehearing En Banc Denied Jan. 6, 1983.

William G. Sullivan, James R. Carroll, Asst. Attys. Gen., Chicago, Ill., for defendants-appellants.

William D. Heinz, Jenner & Block, Chicago, Ill., for plaintiff-appellee.

Before BAUER and WOOD, Circuit Judges, and CAMPBELL,[*] Senior District Judge.

BAUER, Circuit Judge.

Plaintiff-appellee Johnny Smith brought this class action on behalf of himself and other similarly situated inmates incarcerated at Pontiac Correctional Center (Pontiac), a maximum security state penitentiary located in Pontiac, Illinois. Smith challenged the confinement conditions at Pontiac, alleging that the institutional practice of housing two prisoners in a single cell violated the eighth amendment's prohibition against cruel and unusual punishment. The district court agreed and ultimately ordered wide-ranging relief, including the elimination of double occupancy cells at Pontiac. Defendants-appellants, various officers of the Illinois Department of Corrections (IDOC), now appeal. We reverse.

I

The district court's findings of fact and conclusions of law are set out in its opinion. *Smith v. Fairman,* 528 F.Supp. 186 (C.D.Ill. 1981). As the trial court noted, Pontiac houses inmates convicted of serious crimes involving violence and threat to human life, such as murder, armed robbery and rape. More than 1600 such prisoners were confined in the institution at the time this cause was tried, well over the 1871 facility's original capacity of 1200 persons. Approximately 56% of the prisoner population was double celled; the remaining inmates were single celled for segregation or other reasons.

Judge Baker inspected and measured the cells at Pontiac. He found that the two-man cells in the West cellhouse, which were 64.5 square feet in size, "appeared to be fairly clean and neat and the individual cells showed good housekeeping practices."

* The Honorable William J. Campbell, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

528 F.Supp. at 188. The 55.3 square-foot double cells in the South cellhouse were also neat and clean. The North cellhouse single units, which measured 55.5 square feet, were in somewhat poorer condition. The district court thought this situation probably was attributable to the lower concern for cleanliness exhibited by North cellhouse prisoners, most or all of whom were placed there for disciplinary or protective custody purposes.

The district court also described the living amenities in the West cellhouse units. For example, each double cell had a sink, a sanitary stool, two beds, and a chest of drawers or boxes for clothing and personal belongings. Books, records, and electronic entertainment equipment filled many cells, leaving as little as nine square feet for standing room in some cases. 528 F.Supp. at 188. We gather that the same or similar items crowded the double and single units in the South and North cellhouses, respectively.

The small size of the double cells and the clutter within them made life uncomfortable for the inmates. Their discomfort was exacerbated by the long hours prisoners spent in their cells, in some instances, up to twenty hours a day. Many prisoners worked or attended school during the week, but a large segment of the population did not enjoy such diversions. Prisoners in segregation spent as much as twenty-three hours a day in their cells.

In addition to these findings, Judge Baker noted certain testimony by inmates and the court-appointed expert, Doctor Steven Christianson, to the effect that Pontiac's double cells were cramped, dimly lit, poorly ventilated, and occasionally without hot tap water. 528 F.Supp. at 189. Doctor Christianson, however, was unfamiliar with the ventilation system and thus unaware that the system could have been shut off which might have explained the seemingly substandard ventilation. Tr. Vol. I at 94.

Apparently cell airflow also was obstructed when prisoners covered their vents to block roaches. In any event, airflow was hardly optimal because a "borderline stench" pervaded the West and South cellhouses due to the sheer size of the confined population. 528 F.Supp. at 194. The presence of vermin, however, was disputed by correctional expert C. Paul Phelps. He stated that the units in the West and South cellhouses were unusually clean and that absent such cleanliness insects and rodents would abound because of the large quantity of food prisoners kept in their cells. Phelps believed no vermin problem existed based on the manner in which inmates stored food and their failure to mention such pests. Tr. Vol. VI at 1065–66.

Although numerous experts and prisoners testified that crowding was causing tension among the prisoners, the topic of institutional safety was barely discussed in the lower court's opinion, except for a few references to prisoners' remarks that they felt unsafe or were afraid of homosexual assaults. In contrast, the record testimony of Pontiac Warden James W. Fairman demonstrated that the total number of incidents of physical violence, force, or assault had been reduced by nearly 50% since his administration took office in 1978. His figures—unchallenged on cross-examination—supported his conclusions. Warden Fairman also testified that no inmate had killed another inmate during his two year tenure, nor had any guards been killed or seriously injured by inmates during that period. Tr. Vol. VII at 1311–14.

Finally, the district court's opinion failed to note that Pontiac inmates received satisfactory medical attention and nutritious food. A licensed physician staffed the institution twenty-four hours a day, seven days a week. Tr. Vol. III at 542. Similarly, Pontiac employed a full time dentist, dental assistants, a full time x-ray technician, and a full time pharmacist to meet the inmates' health needs. Id. The kitchen and dining facilities were considered clean, Tr. Vol. VI at 1081–82; Tr. Vol. VII at 1252–54, and the food was at least palatable, if not good according to one expert. Tr. Vol. VII at 1252.

## II

In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court addressed the constitutionality of double celling for the first time. The *Rhodes* Court refused to embrace the notion that double celling by itself inflicts pain that amounts to a violation of the constitution. *Id.* at 348–49, 101 S.Ct. at 2399–2400. Instead the Court stated that prison conditions "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 347, 101 S.Ct. at 2399. Relying on its prior holding in the plurality opinion of *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Court emphasized that the eighth amendment prohibition of cruel and unusual punishment is a fluid concept which "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 452 U.S. at 346, 101 S.Ct. at 2398, *quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

While admitting that such an open-ended principle necessarily contemplates judicial determinations of the extent of the eighth amendment's evolution, the *Rhodes* Court admonished that this standard did not mean judges are free to substitute their subjective views on this subject for those of society. Rather, we must form our judgments on the basis of "objective factors to the maximum possible extent." 452 U.S. at 346, 101 S.Ct. at 2398.

In *Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir. 1981), we expressed our view that *Rhodes* essentially mandated a "totality of the conditions of confinement" approach to cruel and unusual punishment issues. *Accord, Ruiz v. Estelle,* 679 F.2d 1115, 1139–40 (5th Cir. 1982); *Villanueva v. George,* 659 F.2d 851, 854 (8th Cir. 1981) (*en banc*). Vague conclusions that the totality of conditions amounts to a constitutional violation, however, are insufficient. *See Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir. 1982); *Ruiz v. Estelle,* 679 F.2d at 1139 n.98. In this case, then, we must decide whether the prisoners' proof, considered as a whole, is sufficient to establish a violation of the eighth amendment.

Our review of the facts demonstrates that Pontiac inmates receive adequate food and medical care. The sanitary conditions at the prison, though far from perfect, also are reasonable. In light of these circumstances, we can hardly conclude that prisoners are subjected to wanton and unnecessary inflictions of pain. Rather, their food is good, their cells are clean, and their health is maintained.

Indeed, it seems obvious that the crowding problem is at least partly due to the large amount of personal belongings and food officials allow prisoners to keep in their cells. To create more room by depriving inmates of their personal belongings would be nothing more than a substitution of our judicial values for those of prison administrators as to what is good for prisoners. *Rhodes v. Chapman,* 452 U.S. at 351, 101 S.Ct. at 2401. The Supreme Court forbade such subjective adjudication in *Rhodes. Id.* at 346, 101 S.Ct. at 2398.

Although we certainly sympathize with Judge Baker's desire to remedy the conditions at Pontiac, we cannot agree with his assessment of the evidence. It is true that several experts were against double celling and perceived it as harmful, but the stark reality is that physical violence in the institution has declined markedly in the last few years. Thus, the facts fail to support the experts' dire projections. Moreover, the experts' opinions as to what constitutes contemporary standards of decency are merely helpful, not binding. *Rhodes v. Chapman,* 452 U.S. at 348 n.13, 101 S.Ct. at 2400 n.13.

In short, the district court concluded that a constitutional violation was established largely because prisoners were compelled to spend long hours in small cells. With the exception of inmates in segregation, virtually all prisoners spent at least a few hours outside their cells, and those with jobs or classes spend many hours beyond the confines of their cells. Undoubtedly life in a two-man cell at Pontiac is unpleas-

ant and regrettable. But "to the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347, 101 S.Ct. at 2399.

### III

For the foregoing reasons, we conclude that conditions at Pontiac, taken as a whole, do not violate the eighth amendment. Accordingly, the judgment of the district court is

REVERSED.